## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-1834

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 139, AFL-CIO,

*Plaintiff-Appellee*,

*v.*

J.H. FINDORFF & SON, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for
the Eastern District of Wisconsin.
No. 02-C-0358—**Charles N. Clevert, Jr.**, *Judge*.

ARGUED SEPTEMBER 21, 2004—DECIDED DECEMBER 30, 2004

Before EASTERBROOK, RIPPLE, and WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge.* J.H. Findorff & Son belongs to the Allied Construction Employers Association in Milwaukee. On behalf of its members, the Association negotiated a collective bargaining agreement with Local 139 of the Operating Engineers' Union. Members of the Association recognized Local 139 as the bargaining agent for "all heavy equipment operators and other workers in the jurisdiction

of the Union as set forth in Article VI, and Article IX". Article IV requires all employers to ensure that, when "work covered by this Agreement" is subcontracted, the subcontractor must subscribe to the Agreement and use members of Local 139 to do the work.

Findorff was awarded a contract to build a dormitory at the University of Wisconsin's Milwaukee campus. An older structure at the site had to be gutted. Findorff subcontracted that task to J.C. Construction, whose collective bargaining agreement with the Laborers Union assigned its members most of the work. To help break up and remove concrete floor slabs and old drywall, laborers used skid-steer loaders, forklift-sized machines with fittings for attachments such as scoops and jackhammers that can be swapped to suit the task. (J.C. Construction uses Bobcat skid-steer loaders, whose features are described at <http://www.bobcat.com/products/ssl/index.html>.) Local 139 asserted that operating engineers, rather than laborers, should do any of the demolition work that required the use of skid-steer loaders. Findorff disagreed, and the dispute proceeded to arbitration.

After hearing testimony about how skid-steer loaders are used, and which workers operate them at Findorff, arbitrator Neil Gundermann ruled in Findorff's favor. It is undisputed that employees of many trades—laborers, iron workers, and carpenters, as well as operating engineers—use skid-steer loaders in the course of their work. Arbitrator Gundermann asked how it could be, given the language of Article IV, that laborers on Findorff's payroll may use skid-steer loaders, but that laborers on a subcontractor's payroll may not. If all skid-steer work belongs to Local 139, that assignment must hold for Findorff and its subcontractors alike. Witnesses for Local 139 made it clear that they do not claim all skid-steer-loader work, but they insisted that the machine be assigned to Local 139's members when its use is more than "intermittent." The arbitrator thus concluded that use of skid-steer loaders is not the bailiwick of operat-

ing engineers alone. Article IV requires subcontractors to use Local 139 for "work covered by this Agreement" but does not define "covered." Arbitrator Gundermann determined that "work covered by this Agreement" is the work that "heavy equipment operators" perform *exclusively* for the Association's members under the collective bargaining agreement. As use of skid-steer loaders is not exclusively operating engineers' work, a subcontractor likewise need not ensure that it is performed by Local 139's members.

The district court vacated the award. As the judge saw matters, the arbitrator had neglected the collective bargaining agreement's plain language. The judge started with language we have quoted from §1.1—that the bargaining unit comprises "all heavy equipment operators and other workers in the jurisdiction of the Union as set forth in Article VI, and Article IX" plus a comparable provision in §1.3—and moved to Article VI, which says that each employer

> agrees to assign any equipment within the jurisdiction as described below to bargaining unit employees: the operation of all hoisting and portable engines on building and construction work . . . including but not limited to, all equipment listed in Section 9.1 (Wage Classification) of this Agreement.

Section 9.1.4 in turn lists:

> Tamper-Compactors (riding type), Assistant Engineer, A-frames and Winch trucks, Concrete auto breaker, Hydrohammers (small), Brooms and Sweepers, Hoist (tuggers), Stump chippers (large), Boats (tug, safety, work barges and launch), Shouldering machine operator, Screed operator, Stone crushers and Screening plants, Prestress machines, Screed operators (milling machine), Farm or Industrial Tractor mounted equipment, Post hole digger, Fireman (asphalt plants), Air compressor (over and under 400 CFM), Generators (over and under 150 KW), Augers

> (vertical and horizontal), Air, Electric, Hydraulic Jacks (slipform), Skid steer loaders (with or without attachments). . . .

Tracing back through the sequence, the judge found that every piece of equipment listed in §9.1.4 is within the scope of Article VI's reference and thus must be assigned to operating engineers because of the initial reference to the "jurisdiction of the Union". Whatever is in the "jurisdiction of the Union" must be "work covered by this Agreement" for purposes of Article IV's subcontracting clause. And if Local 139 has not protested Findorff's assignment of some skidsteer-loader work to other crafts, that toleration does not diminish its rights under the collective bargaining agreement, the judge concluded.

The district judge's fundamental assumption is that courts rather than arbitrators interpret collective bargaining agreements. Once the court finds an agreement's meaning clear, no arbitrator may read it otherwise. In other words, arbitrators may apply agreements but are not free to err in their construction. Yet Findorff and Local 139 agreed that an arbitrator, not a judge, would interpret and apply this contract. As the Supreme Court frequently explains,

> Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36 (1987). We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000) (quoting *Misco, supra*, at 38). It is only when the arbitrator strays from interpretation and application of the

agreement and effectively "dispenses his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001). If a gaffe authorized a court to set aside the award, there would be little difference between arbitration and litigation other than the extra cost and delay of presenting the case to the arbitrator before taking it to court. That would turn arbitration on its head; the process is designed to achieve speed, lower cost, and expertise. That can be accomplished only if courts enforce intellectually honest arbitral decisions, even if the court thinks the arbitrator's decision mistaken. It is why "the question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987).

The principle is the same whether or not the district judge deems the agreement "clear"—a decision that can be made only after the extended and costly process of litigation that arbitration is supposed to avert. Under *Garvey* and its predecessors, misinterpretation of contractual language, no matter how "clear," is within the arbitrator's powers; only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award. There is a big difference—a clear difference, a plain difference—between misunderstanding and ignoring contractual language.

The district judge did not doubt that Arbitrator Gundermann was construing this collective bargaining agreement rather than supplying a rule that he preferred *to* the parties' agreement. Instead the judge applied a

"plain-meaning exception" to the normal rule that an arbitrator's power to decide includes the power to err. Apart from what the Supreme Court has had to say about the propriety of such an exception is the fact that what may seem "plain" to a judge is not necessarily plain to persons with greater experience in the business that the agreement is designed to cover. Arbitrators, often chosen because of their expertise in the industry, may see nuances that escape generalist judges. Persons steeped in the specialized language of a trade, or the business norms against which the language was written, often eschew "plain meaning" in favor of context, while generalists use a more text-bound approach because that is easier and less error- prone for outsiders. See generally Frederick Schauer, *The Practice and Problems of Plain Meaning*, 45 Vand. L. Rev. 715 (1992); Schauer, *Statutory Construction and the Coordinating Function of Plain Meaning*, 1990 Sup. Ct. Rev. 231.

Arbitrator Gundermann doubted the wisdom of a "plain-meaning approach" to this agreement not only because there is neither a "clear" meaning (nor a definition of any kind) for the vital phrase "work covered by this Agreement" in Article IV, but also because the parties themselves did not treat the operating engineers as entitled to perform all work on skid-steer loaders. A collective bargaining agreement is a long-term relational contract, whose interstices properly may be fleshed out with what often goes by the name "the law of the shop." See, e.g., *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 310-12 (1989). Local 139 acknowledges this form of common law by its own reluctance to claim for its members all skid-steer-loader work at Findorff itself. Witnesses at the hearing estimated that between 80% and 90% of all hours on skid-steer loaders at the Association's general contractors are logged by workers represented by the Laborers' Union. No wonder the operating engineers were unwilling to advance the unconditional claim to jurisdiction that the district judge thought

"plain." Arbitrator Gundermann treated the skid-steer loader as a *tool* useful to many crafts rather than a *job* for one craft; that tracks how the parties themselves behaved.

Other parts of §9.1.4 demonstrate that this language cannot be read back into Article VI to establish exclusive jurisdiction. "Brooms and Sweepers" appear in the list. Does Local 139 really have exclusive jurisdiction over every use of a broom at every member of the Association and each subcontractor? What then does the Laborers' Union cover? Must members of the Carpenters' Union call on the heavy-equipment operators of Local 139 to sweep sawdust? Must the iron workers summon Local 139's members to brush away filings and shavings? There is no evidence that the parties' understand their own arrangement in that implausible way.

Using "plain meaning" to trump the understanding and practice of *both* parties to an agreement would do neither side a favor. Some practical leavening was needed; that's why the parties gave the task to an arbitrator. See *Pease v. Production Workers Union*, 386 F.3d 819, 823 (7th Cir. 2004). The view that the agreement gives to the operating engineers every use of all equipment listed in §9.1.4 would create a needless jurisdictional war that would require the National Labor Relations Board to step in, for other collective bargaining agreements allow members of other unions to use some of the same equipment in their own crafts. Arbitrator Gundermann's resolution avoided that risk.

*Anheuser-Busch, Inc. v. Beer & Soft Drink Union*, 280 F.3d 1133 (7th Cir. 2002), was the only decision on which the district court relied for the proposition that, if the court deems contractual language "plain," the arbitrator is forbidden to select any other interpretation. The judge quoted at length from what he styled the majority opinion in *Anheuser-Busch*, but what he should have called the lead

opinion—for the three members of the panel wrote separately, and none spoke for a majority. Language in the lead opinion, taken out of context, could be understood to support the view that judges may override arbitrators' decisions by calling the language "clear" or "plain." The dissenting opinion disagreed with that view. See *id*. at 1146-49. Judge Rovner, whose concurring opinion tipped the balance, thought that the arbitrator had expressly declared unwillingness to be bound by the contract's language and had elected to implement a pre-contractual policy instead. *Id*. at 1145-46. She wrote: "I think it evident that [the arbitrator's] decision purporting to interpret the 1998 agreement relied substantially on the unwritten understandings and lengthy course of conduct that preceded that agreement—and resort to such pre-signing conduct was verboten under the express terms of the contract. To that extent, I agree that the arbitrator exceeded his authority, and that his award must be vacated." *Id*. at 1146. *Anheuser-Busch* thus does not commit this court to the proposition that a judicial declaration of "plain meaning" displaces an arbitrator's interpretation. Any such rule would be incompatible with *Garvey* and its predecessors, as well as *Hill* and dozens of other decisions in this circuit.

The judgment is reversed, and the case is remanded for entry of a judgment enforcing the arbitrator's award.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*