In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-2609

CLEAR CHANNEL OUTDOOR, INC.,

*Plaintiff-Appellant,*

*v.*

INTERNATIONAL UNIONS OF PAINTERS
AND ALLIED TRADES, LOCAL 770,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 30—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED FEBRUARY 25, 2008—DECIDED MARCH 12, 2009

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* After an arbitrator overturned
the decision of Clear Channel Outdoor, Inc. ("Clear Chan-
nel") to discharge one of its employees for a workplace
safety violation, Clear Channel brought suit to vacate
the arbitrator's award. *See* 29 U.S.C. § 185(a). The district
court instead confirmed the arbitrator's decision, con-
cluding that the arbitrator had acted within his authority

to interpret the collective bargaining agreement between Clear Channel and its unionized workforce. *Clear Channel Outdoor, Inc. v. Int'l Unions of Painters & Allied Trades, Local Union 770*, 2007 WL 1655438 (E.D. Wis. June 6, 2007). We affirm.

### I.

Clear Channel Outdoor, which bills itself as the world's largest outdoor advertising company, owns and maintains approximately 1,500 billboards in and around Milwaukee, Wisconsin. Local 770 of the International Union of Painters and Allied Trades, AFL-CIO represents the painters and construction workers who work on Clear Channel's Milwaukee-area billboards. As of his discharge in 2003, Patrick Rogney had worked for the Milwaukee Divison of Clear Channel and its predecessor, Eller Media/Milwaukee, for twenty-two years and had been a crew chief for the last ten of those years. Rogney is a member of Local 770 and has served as a union steward and held other offices within the union.

Safety rules promulgated by the Occupational Safety and Health Administration ("OSHA") require a billboard worker like Rogney to wear a body harness when working six feet or more off the ground. *See* 29 C.F.R. § 1926.501(b)(1). The harness has a lanyard that connects to a wire spanning the length of the billboard, thus preventing the worker from falling to the ground in the event he slips off the billboard platform. In 2002, a co-worker of Rogney's fell to his death after he failed to

attach his safety harness to the safety cable of the billboard he was working on.

Clear Channel (as the successor to Eller Media/Milwaukee) and Local 770 were parties to a collective bargaining agreement dated June 1, 2001 (the "CBA"). The following CBA provisions (which refer to Local 770 as "the Union" and Clear Channel as "the Employer" and "the Company") are relevant to this appeal:

## ARTICLE VI
## DISCIPLINE AND DISCHARGE

Section 1:  The Union recognizes and acknowledges that the Employer has the duty of maintaining good discipline among its Employees because the Employer is responsible for the efficient operation of its businesses.

Section 2:  *The Employer shall have the right to discipline and/or discharge Employees for just cause.*

Section 3:  *In the case of any offense for which an Employee may be discharged, the Employer may, in its sole discretion, impose a lesser penalty.*

Section 4:  *The following shall constitute causes for discharge or other disciplinary action*, and their enumeration here is by way of illustration and shall not be deemed to exclude or restrict the Employer's right to discharge Employees for any other just cause.

* * *

b.   *Violation of Employer rules and safety rules.*

\* \* \*

## ARTICLE VII
## GRIEVANCE PROCEDURE

Section 1:   A grievance is defined as a claim or dispute with the Company by an Employee or Employees, including an alleged violation by the Company, of the terms of this Agreement. . . . The Employer and the Union agree that they will settle all grievances that may arise regarding the interpretation or application of any of the terms of this Agreement in the following manner:

\* \* \*

c.         . . . [T]he Union may submit the grievance to arbitration for final disposition by giving written notice to the Employer of its desire to arbitrate. . . . The parties shall attempt to select a mutually agreeable arbitrator . . . .

. . . The arbitrator shall interpret and apply this Agreement in an effort to settle this dispute but *the arbitrator shall have no power to add to, subtract from, or otherwise modify the terms of this Agreement, and the arbitrator's decision shall be final and binding on the parties to the Agreement, and the employee involved.* . . .

\* \* \*

## ARTICLE XIV
## SAFETY AND HEALTH

Section 1: When protective devices and other safety equipment are required by OSHA and/or the Employer, their use by Employees is mandatory.

Section 2: Safety requirements of OSHA and the Employer must be complied with and safety equipment as furnished by the Company must be used or reprimand steps as follows will be in effect:

1st Offense - Written reprimand shall be given to the Employer and a copy sent to the Union local.

2nd Offense - Five (5) days suspension without pay.

3rd Offense - Discharge for cause.

Section 3: *If any Employee fails to use, in the manner prescribed by OSHA and/or the Employer, safety belt and/or harness and/or safety line equipment, which is provided and the use of which is required by OSHA and/or the Employer, the Union, and the Employee agree that this is a safety offense of such serious matter that the Employer shall proceed directly to the discipline step as set forth above as "3rd Offense" and the Employee may be immediately discharged.*

* * *

R. 17 Joint Ex. 1 (Emphasis ours.)

Clear Channel required its billboard workers to undergo safety training on an annual basis. Rogney participated in such a training session on July 23, 2002. At the conclusion of that training, he signed a "Personal Fall Protection Equipment" statement acknowledging that he had been instructed in the use and care of fall arrest systems and equipment and certifying that "I understand the use of the body harness and other personal fall arrest equipment is mandatory and is to be used in the manner prescribed by OSHA and/or the Company." R. 17 Employer Ex. 5. Rogney also signed a separate statement containing the following acknowledgment:

> Further, I have been trained in the use of the described personal fall protection equipment and understand that improper use or not using prescribed equipment in a safety-sensitive environment will be grounds for immediate termination of employment.

R. 17 Employer Ex. 6.

On April 2, 2003, Rogney was working with a crew on a Clear Channel billboard located at the intersection of Capital Drive and Green Bay Avenue in Milwaukee. The platform on which the employees were working was eighteen or more feet above the ground. Rogney was wearing a full-body safety harness, and initially his harness was connected to the billboard's safety cable. However, at some point, as Rogney stepped around one of his co-workers, he unhooked the lanyard from the cable and then neglected to reattach it.

While Rogney was working with his lanyard disconnected from the safety cable, a company official happened to drive by. Paul Sara, president of Clear Channel's Milwaukee Division, was performing a periodic inspection of some of Clear Channel's billboards—which he calls "driving the plant." As he approached the Capitol Drive billboard, he saw the crew working on that billboard and noticed that two of the workers did not have their lanyards connected to the billboard's safety cable. He stopped to get a closer look and observed the crew for a period of about eight minutes. Sara did not call the safety violation to the workers' attention. Instead, he telephoned the company's operations manager, Rick Schoenholtz, and told Schoenholtz what he had seen. Sara expressed his displeasure, noting that the employees' omission was an "unacceptable" violation of Clear Channel's policies; Schoenholtz agreed.

Schoenholtz and supervisor Tom Riley met with Rogney later that day and told him what Sara had seen. At no time did Rogney dispute that he had violated the company's safety rules by working on the billboard with his lanyard unhooked. Rogney was immediately suspended pending further investigation, as was the other employee seen working without his lanyard attached to the safety cable. Two days later, the company discharged them both.

Local 770 subsequently filed a grievance protesting Rogney's discharge, contending that he had been fired without good cause. The parties selected a mutually acceptable arbitrator, Fredric R. Dichter, and, by agreement, submitted the following questions for his decision:

"Did the Employer have just cause to discharge the Grievant [Rogney]? If not, what is the appropriate remedy." *See* R. 1 Ex. 4 at 1. The arbitrator conducted an evidentiary hearing on September 10, 2003, after which the parties submitted written briefs. Three months later, the arbitrator rendered a written decision and award.

Arbitrator Dichter determined that Rogney's discharge was without just cause and that a six-month suspension without pay was an appropriate penalty. He read Article XIV's provision that an employee *may* be discharged for committing the type of safety violation that Rogney did, together with Article VI's provision that the employer may only discharge an employee for "just cause," to mean that Clear Channel's discretion to discharge an employee was limited. R. 1 Ex. 4 at 7-8. Just cause, as the arbitrator interpreted that term, required Clear Channel to consider not only whether the employee committed an offense for which the agreement *permits* discharge, but also whether the particular transgression *warranted* discharge. *Id.* at 8. It was the arbitrator's role, in turn, to assess de novo whether the circumstances rendered discharge too harsh a penalty, and in Arbitrator Dichter's view, it was in Rogney's case. *Id.* at 8-9. Although the arbitrator conceded that Rogney's transgression was a serious offense that could have had "disastrous" consequences, he had a "very hard time understanding" how a member of Clear Channel's management could stand by watching Rogney and his co-worker laboring in an unsafe manner for a period of eight minutes without doing anything to intervene. *Id.* at 11. "To sustain the discharge under these circumstances

would be asking the Arbitrator to treat the offense more seriously than the Employer did at the time the offense was actually being committed." *Id.* In view of Rogney's perfect prior record, his long tenure with the company, the fact that he was wearing his safety harness and had the lanyard connected to the safety wire earlier, coupled with Clear Channel's inaction, discharge was too severe a penalty, in the arbitrator's view; the company therefore lacked just cause to fire Rogney. *Id.* It did, however, have just cause to impose "stern[ ] discipline." *Id.* at 12. As of the date of the decision, Rogney had been out of the company's employ for more than eight months. The arbitrator believed that a six-month suspension without pay was an adequate penalty. *Id.* He ordered Rogney reinstated subject to that penalty and directed Clear Channel to make Rogney whole for the balance of two and one-half months that Rogney had been separated from its employ.

The district court denied Clear Channel's motion to vacate the award and granted the union's motion to confirm it. 2007 WL 1655438. The court noted at the outset that the question before it was whether the arbitrator interpreted the collective bargaining agreement, not whether he did so erroneously. *Id.* at *6. Having reviewed the arbitrator's decision, the court was satisfied that the arbitrator did indeed interpret the parties' agreement. "Regardless of whether his interpretation was strained or even a serious error, the award must stand. *Id.* The court rejected Clear Channel's suggestion that the decision was contrary to public policy. The relevant consideration in that regard was "not

whether the employee's failure to wear the harness violates public policy but whether the order to reinstate does." *Id.* at *7. The court recognized that there is a strong federal interest in workplace safety, but reasoned that a six-month suspension does not necessarily condone a worker's failure to comply with safety rules. *Id.*

## II.

As is common in collective bargaining agreements, Article VII of the agreement between Local 770 and Clear Channel sets forth a grievance procedure to resolve disputes between the company and its employees which provides for binding arbitration of any grievance that the company and the union are unable to settle. Speaking to the arbitrator's authority, the agreement provides that "[t]he arbitrator shall interpret and apply this Agreement in an effort to settle this dispute but the arbitrator shall have no power to add to, subtract from, or otherwise modify the terms of this Agreement and the arbitrator's decision shall be final and binding on the parties to the Agreement and the Employee involved." Article VII, § 1(c).

Courts play a "very limited" role in reviewing a labor arbitrator's decision. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509, 121 S. Ct. 1724, 1728 (2001) (per curiam). We do not review the merits of the decision. *Ibid*; *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36-38, 108 S. Ct. 364, 370-71 (1987); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S. Ct. 1358, 1360 (1960). To do so would

upset the bargain that the parties struck to have their agreement construed by an arbitrator rather than a court and in the process undermine the federal policy of resolving labor disputes privately. *Misco*, 484 U.S. at 36-38, 108 S. Ct. at 370-71; *Enterprise Wheel & Car*, 363 U.S. at 599, 80 S. Ct. at 1362. "Our review is . . . limited to determining whether the arbitrator 'exceeded the powers delegated to him by the parties,' i.e., whether he failed to arbitrate the dispute in accord with the agreement." *Arch of Ill., Div. of Apogee Coal Corp. v. Dist. 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292 (7th Cir. 1996) (quoting *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985)).

Whether we believe the arbitrator's decision to be right or wrong is immaterial; what matters is whether the arbitrator's decision was animated by the collective bargaining agreement. *Garvey*, 532 U.S. at 509-10, 121 S. Ct. at 1728-29; *Int'l Union of Operating Eng'rs, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004). "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco*, 484 U.S. at 36, 108 S. Ct. at 370 (quoting *Enterprise Wheel & Car*, 363 U.S. at 597, 80 S. Ct. at 1361). A decision draws its essence from the collective bargaining agreement when it has a plausible foundation in the terms of the agreement. *See Monee Nursery & Landscaping Co. v. Int'l Union of Operating Eng'rs, Local 150*, 348 F.3d 671, 675 (7th Cir. 2003); *Butler Mfg. Co. v. United Steelworkers of Am.*, 336 F.3d 629, 633 (7th Cir. 2003); *Jasper Cabinet Co. v. United Steelworkers of Am.*, 77 F.3d 1025, 1028-

29 (7th Cir. 1996). We resolve doubts in that regard in favor of enforcing the award. *E.g.*, *Am. Postal Workers Union, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999); *see also Enterprise Wheel & Car*, 363 U.S. at 597-98, 80 S. Ct. at 1361. "It is only when the arbitrator *must have* based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to 'draw its essence from the collective bargaining agreement.'" *Arch of Ill.* 85 F.3d at 1292 (quoting *Ethyl Corp.*, 768 F.2d at 184-85) (emphasis in *Arch of Ill.*); *Polk Bros., Inc. v. Chicago Truck Drivers Union*, 973 F.2d 593, 597 (7th Cir. 1992)); *see also Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991) ("a noncontractual basis can be inferred and the award set aside" when "there is no possible interpretive route to the award").

Here the arbitrator without question was interpreting the agreement. The arbitrator understood that it was his task to construe the provisions of the collective bargaining agreement and to apply those provisions to the facts presented to him. R. 1 Ex. 4 at 8. He included in full the relevant provisions of the agreement in the background set forth at the outset of his opinion. *Id.* at 3-4. His ensuing analysis was grounded in those provisions. The arbitrator deemed the permissive language found in Article XIV, section 3 regarding Clear Channel's power to discharge an employee particularly important: whereas Article VI, Section 3 purports to grant to the employer the sole discretion to impose a lesser penalty for an offense that subjects an employee to immediate discharge, Article XIV, Section 3 states that an employee

"*may* be immediately discharged" for failing to use a safety belt and/or harness in the manner prescribed by OSHA and the employer. The latter provision's "use of the word 'may' implies that in certain circumstances a lesser penalty would be appropriate." *Id.* at 7-8. By leaving the door open to a lesser penalty, the arbitrator believed, the agreement imposed on the employer the obligation to exercise its discretion in determining which penalty to impose "within the confines of the remainder of the Agreement." *Id.* at 8. Elsewhere in the agreement, the parties had agreed that no employee was to be discharged without just cause, and "[j]ust cause, as the Union notes, is not limited to a determination of whether the employee did the act, but also includes a determination as to whether the act warranted the most serious penalty that can be imposed in the industrial setting, discharge." *Id.* Furthermore, the parties had granted the arbitrator the authority to interpret and apply the agreement, and the existence (or not) of just cause was an issue that arbitrators regularly deal with. *Id.* Thus, although the arbitrator acknowledged that the contract grants to the employer the power to discharge an employee for failing to use his safety harness, he understood the use of the permissive word "may" in setting forth that power, coupled with the contract's no-discharge-without-just-cause provision, to limit the exercise of that discretion and to subject the employer's choice of penalty to a kind of proportionality review. *Id.* at 8-9. The arbitrator then proceeded to consider the relevant facts, including the gravity of the safety violation, Sara's failure to do anything to correct

the violation while he was observing it take place, the apparently inadvertent nature of the violation, Rogney's long tenure with the company, and his otherwise unblemished record. Those facts persuaded the arbitrator that just cause did not exist to support the decision to discharge Rogney, although they did support a lesser penalty of six months' suspension without pay. *Id.* at 11-12.

The arbitrator's decision thus drew its essence from the collective bargaining agreement: It was tethered to the language of the agreement, it set forth an arguable construction of the agreement, and it applied that interpretation to the facts that the parties submitted. *Cf. Jasper Cabinet*, 77 F.3d at 1029 ("[The arbitrator's] examination of the contract articles and her reliance on the specific contract word 'is' in finding an implicit condition of reasonable time was contract interpretation—plain and simple."). It is not possible for us to say that the decision must have been based on something outside of the contract, *see Arch of Ill.*, 85 F.3d at 1292, or that there was no possible interpretive route to the award, *see Chicago Sun-Times*, 935 F.2d at 1506.

Nor is it possible for us to characterize the decision as extra-contractual, as Clear Chanel would have us do, on the ground that the arbitrator ignored a key provision of the contract. *See J.H. Findorff & Son*, 393 F.3d at 745. The company asserts that the arbitrator must have turned a blind eye to Article VI, Section 4(b) of the collective bargaining agreement, which cites a violation of safety rules as a "cause[ ] for discharge or other disciplinary action." Clear Channel views that provision as

irreconcilable with the notion that it lacked just cause to discharge Rogney, whose violation of safety rules was undisputed. Yet, the arbitrator did not ignore Article VI, Section 4(b): He quoted the full text of that provision along with the other relevant provisions of Article VI and Article XIV at the outset of his decision. It is true that the arbitrator did not mention this provision later in his decision, when he compared the provisions of Article VI and Article XIV and concluded that although they granted the employer the discretion to discharge an employee for failing to properly use his safety harness, the exercise of that discretion was reviewable and could be overturned if the arbitrator concluded that the circumstances did not warrant discharge as opposed to a lesser penalty. But we think it highly unlikely that the arbitrator's analysis would have looked different, let alone led to a different result, had he specifically adverted to Article VI, Section 4(b) in his effort to construe the two articles together. Section 4(b) expressly recognizes a safety violation as cause for a discharge "*or other disciplinary action*," and as such recognizes, just as Article XIV, Section 3 does, that an employer "may" opt for a lesser penalty in lieu of discharge when an employee has committed a safety violation. We have no reason to doubt that the arbitrator, had he returned to the language of Article VI, Section 4(b) and addressed it specifically, would have construed the discretion it conveyed on the employer to opt for a penalty other than discharge in the same way he construed the parallel language of Article XIV, Section 3. For all we know, that is precisely what the arbitrator did, without saying so.

But the notion that he ignored this provision is untenable given that he explicitly recognized the provision early on in his decision. *See Chicago Sun-Times*, 935 F.2d at 1505-06.

What Clear Channel's argument boils down to is that the arbitrator's decision is contrary to the plain meaning of the contract; but this is simply another way of arguing that the decision is wrong on the merits, and that is precisely the type of argument that is beyond our purview. It bears repeating that our task in reviewing a labor arbitrator's award is to ensure that the arbitrator was interpreting the collective bargaining agreement, not that he was doing so correctly. *Garvey*, 532 U.S. at 509-10, 121 S. Ct. 1728; *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90*, 418 F.3d 762, 770 (7th Cir. 2005). Even if we are convinced that the arbitrator's error in interpreting the parties' agreement was plain, we lack the authority to intervene. *See Garvey*, 532 U.S. at 509, 121 S. Ct. at 1728 ("if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision") (internal quotation marks and citations omitted). We specifically rejected such a contention in *J.H. Findorff & Son*:

> If a gaffe authorized a court to set aside the award, there would be little difference between arbitration and litigation other than the extra cost and delay of presenting the case to the arbitrator before taking it to court. That would turn arbitration on its head; the process is designed to achieve speed, lower cost, and

expertise. That can be accomplished only if courts enforce intellectually honest arbitral decisions, even if the court thinks the arbitrator's decision mistaken. It is why "the question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987).

The principle is the same whether or not the [court] deems the agreement "clear"—a decision that can be made only after the extended and costly process of litigation that arbitration is supposed to avert. Under *Garvey* and its predecessors, misinterpretation of contractual language, no matter how "clear," is within the arbitrator's powers; only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award. There is a big difference—a clear difference, a plain difference—between misunderstanding and ignoring contractual language.

393 F.3d at 745; *see also Arch of Ill.*, 85 F.3d at 1292; *Chicago Sun-Times*, 935 F.2d at 1505. The court added that although the meaning of contractual terms may seem plain to a court, they may not to an arbitrator with a background in the subject matter of the collective bargaining agreement. "Arbitrators, often chosen because of their expertise in the industry, may see nuances that escape generalist judges." *J.H. Findorff & Son*, 393 F.3d at 746.

In an effort to dispense with the burden of showing that the arbitrator was not interpreting the contract, Clear Channel relies on a line of cases from other circuits holding that once an arbitrator finds that a violation has occurred for which the contract language authorizes discipline up to and including termination at the employer's discretion, the arbitrator necessarily has found just cause for discharge and generally may not review the propriety of the employer's decision to fire the offending employee rather than imposing lesser discipline. *See Textile Workers Union of Am., Local Union No. 1386 v. Am. Thread Co.*, 291 F.2d 894, 899-900 (4th Cir. 1961) (2-1 decision); *see also, e.g., Poland Spring Corp. v. United Food & Commercial Workers Int'l Union, Local 1445*, 314 F.3d 29, 34-35 (1st Cir. 2002) (2-1 decision); *Int'l Bhd. of Elec. Workers, Local 175 v. Thomas & Betts Corp.*, 182 F.3d 469, 472 (6th Cir. 1999); *Butterkrust Bakeries v. Bakery, Confectionery, & Tobacco Workers Int'l Union, Local 361*, 726 F.2d 698, 700 (11th Cir. 1984) (2-1 decision); *see also Am. Eagle Airlines, Inc. v. Air Line Pilot's Ass'n*, 343 F.3d 401, 409-10 (5th Cir. 2003) (2-1 decision). But this circuit has never embraced that line of authority. In *Int'l Ass'n of Machinists, Dist. No. 8 v. Campbell Soup Co.*, 406 F.2d 1223, 1226 (7th Cir. 1969), we distinguished the Fourth Circuit's decision in *American Thread* on two grounds, noting first that the agreement at issue in *American Thread* expressly identified the ground on which the employee had been fired as just cause for discharge and contained a clause barring the arbitrator from making an award that changed, modified, or added to the agreement, and second that the arbitrator in *American Thread* had expressly found the

existence of just cause to discharge the employee. Here, as in *American Thread*, the contract cites the basis for Rogney's discharge as just cause and deprives the arbitrator of the authority to modify the terms of the collective bargaining agreement, so we cannot make that distinction. *But see Ethyl Corp.*, 768 F.2d at 185-86 (noting that contract's no-modification provision did not compel arbitrator to adopt literal interpretation of contract or preclude him from finding implied condition). But just as in *Campbell Soup*, the arbitrator here concluded that, under the terms of the contract, the employer *lacked* just cause to fire the employee. The latter conclusion constitutes a plausible interpretation and application of the agreement, and brings this case into line with *Campbell Soup. See also IMC-Agrico Co. v. Int'l Chem. Workers Council of United Food & Commercial Workers Union,* 171 F.3d 1322, 1327-28 (11th Cir. 1999) (drawing same distinction). We note further that *Campbell Soup* is hardly the only decision in which we have sustained an arbitration award directing the reinstatement of an employee notwithstanding the fact that the employee had committed a transgression for which the employer was authorized by the contract to discharge the employee. *See, e.g., Arch of Ill.,* 85 F.3d at 1293-94; *F.W. Woolworth Co. v. Misc. Warehousemen's Union, Local No. 781*, 629 F.2d 1204, 1215-16 (7th Cir. 1980) (2-1 decision).

The arbitrator's decision was not contrary to public policy. As the district court observed, the relevant consideration is not whether Rogney's failure to use his safety harness properly was contrary to the federal interest in workplace safety, as manifested by the OSHA regula-

tion, but rather whether ordering him reinstated would violate that interest. 2007 WL 1655438, at *7; *see Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 63, 121 S. Ct. 462, 467 (2000). Clear Channel has cited nothing in the federal regulations that forbids the reinstatement of an employee who has committed this type of safety violation. Rogney's reinstatement does not in any way force the company to violate federal rules. And we cannot say that the reinstatement of a long-term employee with an otherwise positive record *after* a six-month suspension without pay—a rather substantial penalty—jeopardizes Clear Channel's ability to enforce workplace safety rules or is otherwise irreconcilable with the strong public policy interest in workplace safety. *Id.* at 65-66, 121 S. Ct. at 468.

Finally, we reject Clear Channel's contention that the arbitrator lacked the authority to decide what penalty was appropriate for Rogney's safety violation. The parties themselves agreed that in the event the arbitrator concluded that the company lacked just cause to terminate Rogney, he could determine what penalty was appropriate. The parties did the same in *Campbell Soup*, and we concluded that in doing so they had recognized the authority of the arbitrator to adjust the penalty that the employer had imposed: "We think it is clear from the issue submitted to the arbitrator that he was faithful to his obligation and substantially followed the Supreme Court guidelines in *Enterprise*." 406 F.2d at 1225. *See also F.W. Woolworth*, 629 F.2d at 1216.

All this is not to say that we necessarily agree with the arbitrator's construction of the contract, which gave

Clear Channel the discretion to fire an employee for violating a safety rule *and* cited such a violation as just cause justifying a discharge. But it was not our construction of the contract for which the parties bargained. They agreed to have an arbitrator interpret their agreement. And because the arbitrator's decision drew its essence from the agreement, we are obliged to uphold the arbitrator's award.

## III.

The arbitrator acted within his authority to interpret and apply the contract in concluding that Clear Channel lacked just cause to discharge Rogney and in ordering him reinstated subject to a six-month suspension without pay. The district court therefore properly denied Clear Channel's request to overturn the arbitrator's award and granted the Union's request to confirm it. Although Clear Channel has not prevailed in its appeal, we do not find the appeal frivolous and therefore deny Local 770's request for sanctions pursuant to Federal Rule of Appellate Procedure 38.

AFFIRMED.