# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-3144

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 1546,

*Plaintiff-Appellee,*

*v.*

ILLINOIS-AMERICAN WATER COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 1411—**Suzanne B. Conlon**, *Judge.*

ARGUED FEBRUARY 17, 2009—DECIDED JUNE 26, 2009

Before POSNER, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Illinois-American Water Company
("IAWC") terminated Glenn Williams after he failed to
abide by the terms of a Last Chance Agreement ("LCA").
At the time of Williams's dismissal, United Food and
Commercial Workers, Local 1546, the labor organization
that represents many of IAWC's employees, was chal-
lenging the validity of the LCA. The Union grieved Wil-

liam's termination as well, and both grievances proceeded to arbitration, where an arbitrator found in the Union's favor.[1] The arbitrator reinstated Williams after concluding that the LCA did not contemplate his termination while the Union's grievance was pending. The district court confirmed the arbitrator's award, and IAWC appeals. We now affirm.

## I. BACKGROUND

Glenn Williams worked in various capacities for IAWC and its predecessors from 1974 until his termination on March 2, 2007. For the last twenty years of his employment, Williams served as an operator, which involved the operation and maintenance of plant equipment used for treating wastewater.

Operators must be licensed by the Illinois Environmental Protection Agency ("IEPA"), which issues four levels of license: Class A, B, C, or D. Individuals with a Class D license are considered operators-in-training. Operator licenses must be renewed every three years. According to IAWC, an operator's wage depends on the level of his or her license, with Class A operators receiving the highest

---

[1] The arbitration also involved disciplinary measures that IAWC instituted against two other employees, Dan Leppert and Ken Nelson. Neither of those disputes is at issue in this appeal.

pay and Class D operators-in-training the lowest.[2] Prior to his termination, Williams's last active license was Class A, which he had earned in 1994.

In October 2006, the IEPA informed Williams that his Class A license had expired in 1997, nine years earlier, because he had failed to renew it. Williams passed this information along to his superiors at IAWC, and the company immediately reduced his compensation level to that of a Class D operator-in-training.

IAWC claimed that operating without a license fell under Offense 12 of its Employees' Guide for Conduct, which addressed the neglect of assigned duties. Williams had been suspended under this provision of the Guide the preceding August, which meant that operating without a license was his second violation of Offense 12 in three months. The Guide specified that a second such offense was punishable by termination.

In lieu of terminating Williams, IAWC offered him an opportunity to remain with the company pursuant to the

---

[2] In a portion of the arbitrator's decision relating primarily to Leppert and Nelson, *see supra* note 1, the arbitrator concluded that "the evidence establishes that [an operator's] wage rate is based upon the job that is performed by the employee, not upon the license that he holds." Notwithstanding this finding, the Last Chance Agreement agreed to by Williams and the Union stipulated that Williams had been overpaid and that he would make restitution for the overpayment. This stipulation superseded any general finding to the contrary by the arbitrator.

terms of a Last Chance Agreement. The LCA placed several conditions on Williams's continued employment. First, IAWC suspended Williams for thirty days without pay. Second, IAWC demanded that Williams obtain at least a Class B operator license within six months of executing the LCA. And third, because Williams had been paid as a Class A operator when he was not licensed as such, he was required to repay IAWC excess compensation that he received from January 1, 2006, until IAWC began paying him at the Class D operator-in-training rate. The LCA stipulated that Williams would arrange a repayment schedule with IAWC within two weeks of signing the agreement.

The LCA contained several other provisions, two of which are relevant to our discussion. The first provision contained the following language:

> Failure to comply with any of these conditions will result in immediate termination. . . . The Union and the Employee expressly waive any right to file a grievance or other claim regarding Employee's discharge under this Agreement, except to contest the fact of what occurred. If the conduct occurred, an Arbitrator will not have any authority to modify the discharge to a lesser penalty.

The second relevant provision stated that "[a]ny disputes regarding the meaning of this Agreement will be resolved solely through the parties' collective bargaining agreement grievance-arbitration procedure."

On November 7, 2006, Williams and IAWC signed the LCA. Also signing as a party to the agreement was the

Union, which represents all operators and various other service people employed by IAWC. The Union filed a grievance contesting the LCA's validity on November 10, three days after signing.

The present dispute arose when Williams failed to make arrangements for the repayment of his excess wages as required by the LCA. On March 2, 2007, several months after Williams completed his unpaid suspension, IAWC representatives gave Williams the opportunity to sign a proposed repayment plan, which Union representatives advised Williams not to sign. According to Williams, the proposed plan would have left with him with only $125 a week on which to live. Faced with such a dire economic decision, Williams followed the Union's advice and refused to sign the plan. IAWC terminated him that same day. The Union then filed a second grievance, this time protesting Williams's dismissal.

Both of the Union's grievances—the first contesting the Last Chance Agreement, the second contesting Williams's termination—were consolidated and brought before an arbitrator, who held a hearing on November 20, 2007. In a written opinion issued February 21, 2008, the arbitrator sustained in part and denied in part the Union's grievances. Dealing first with the threshold question of the LCA's validity, the arbitrator found the agreement to be enforceable and binding upon IAWC, Williams, and the Union. Because the valid LCA contemplated Williams's suspension, obligation to repay excess compensation, and reduction in wage rate pending renewal of his license, the arbitrator denied the Union's challenges in those respects.

Turning to Williams's dismissal, the arbitrator discussed Williams's failure to enter into a repayment plan for excess wages within the time frame established in the LCA. The arbitrator then identified the agreement's pivotal provision, which stated that "[f]ailure to comply with any of these conditions will result in immediate termination." The arbitrator framed the issue as "whether this provision of the Last Chance Agreement justified discharge for failure to enter a repayment plan while a challenge to the validity of the agreement was unresolved." The arbitrator answered this question in the negative, concluding that the LCA did not provide for Williams's termination while a good faith challenge to the validity of the entire agreement was pending. The arbitrator ordered IAWC to reinstate Williams to his operator position and make him whole for lost wages.

In reaching his decision, the arbitrator discussed several issues. First, he stated that the Union's challenges to the LCA's validity, although unsuccessful, were undertaken in good faith and were far from frivolous. Next, he noted that IAWC unilaterally drafted the LCA, requiring that any ambiguities be construed against the company. Third, he characterized the challenge to the LCA as "an act of concerted activity" under the National Labor Relations Act and endeavored to interpret the LCA in a manner consistent with the Act. And fourth, he found it "grossly unreasonable" to interpret the LCA in a manner that allowed for Williams's discharge while he was challenging its overall validity.

Following the arbitrator's decision, both IAWC and the Union sought review in the United States District

Court for the Northern District of Illinois pursuant to 9 U.S.C. § 10. IAWC sought to vacate the arbitrator's decision, while the Union requested that it be confirmed. Acting on cross-motions for summary judgment, the district court, in an order on July 24, 2008, found in the Union's favor and confirmed the arbitration award reinstating Williams. This appeal ensued.

## II. ANALYSIS

On appeal, IAWC seeks relief under the Federal Arbitration Act, 9 U.S.C. § 10(a)(4), which states that a court may vacate an arbitrator's award "where the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." IAWC claims that the arbitrator exceeded his power in two ways: (1) by ignoring unambiguous language in the LCA and looking beyond the four corners of the document; and (2) by infusing his own notions of reasonableness into his interpretation of the contract.

We review *de novo* a district court's decision on cross-motions for summary judgment, *IBEW, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002), meaning that we review the arbitrator's decision as if we were the court of first decision, *see Am. Postal Workers Union, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999). When parties seek judicial review of an arbitrator's award, the role of the courts, both district and appellate, is extremely limited. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001); *Monee Nursery &*

*Landscaping Co. v. Int'l Union of Operating Eng'rs, Local 150*, 348 F.3d 671, 675 (7th Cir. 2003); *see also Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d 914, 921 (7th Cir. 1985) (calling judicial "review" a misnomer due to the extreme deference we give an arbitrator's decision).[3]

A reviewing court will enforce the arbitrator's award so long as it "draws its essence from the contract," even if the court believes that the arbitrator misconstrued its provisions. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 38 (1987)*; see also Ethyl Corp.*, 768 F.2d at 184 (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). An arbitrator's decision draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be. *Ethyl Corp.*, 768 F.2d at 184, 187*; see also Garvey*, 532 U.S. at 509 ("[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." (quotations omitted)). Thus, once we conclude that the arbitrator did in fact interpret the contract, our review is concluded.

---

[3] Our past decisions make clear that we apply the same limited review to arbitral decisions rendered pursuant to the Labor-Management Relations ("Taft-Hartley") Act, 29 U.S.C. § 185; the Railway Labor Act, 45 U.S.C. § 153; and the Federal Arbitration Act, 9 U.S.C. § 10. *See Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d at 921; *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985).

*Ethyl Corp.*, 768 F.2d at 187; *see also Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment v. Union Pac. R.R. Co.*, 522 F.3d 746, 757 (7th Cir. 2008) ("[T]he question before a federal court is not whether the . . . arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." (quotations omitted)).

Indeed, "[i]t is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to draw its essence from the [parties' agreement]." *Ethyl Corp.*, 768 F.2d at 184-85 (quotations omitted). In such cases, the Supreme Court has said that the arbitrator is "dispens[ing] his own brand of industrial justice." *Enterprise Wheel & Car Corp.*, 363 U.S. at 597.

Given our limited role in reviewing arbitral decisions, we conclude that the arbitrator's award must be confirmed. The arbitrator did not disregard the contractual language and dispense his own brand of industrial justice, nor did he exceed his authority in rendering his decision. Instead, the arbitrator confronted a situation that was not expressly contemplated by the parties, interpreted the agreement, and reached a conclusion. In short, he provided exactly what the parties bargained for. That is enough. The arbitrator's decision must stand.

The arbitrator was faced with a peculiar posture: IAWC's power to act under the terms of a contract, the validity of which the Union was challenging.[4] The LCA, by its express provisions, did not contemplate such a scenario. Instead, it addressed each issue independently. IAWC's power to act was clearly provided by the LCA: "Failure to comply with any of [the LCA] conditions will result in immediate termination." Likewise, the Union's ability to challenge the LCA's validity was identified separately: "Any disputes regarding the meaning of this Agreement will be resolved solely through the parties' collective bargaining agreement grievance-arbitration procedure." IAWC and the Union concurrently took action under these separate provisions, creating a contractual tension that the arbitrator was asked to resolve.

IAWC claims that the "failure-to-comply" provision is unambiguous and decisive—if Williams violated the terms of the LCA, IAWC could fire him. It also cites the remainder of that clause, which states that "[t]he Union and the Employee expressly waive any right to file a grievance or other claim regarding Employee's discharge

---

[4] This context is a distinguishing factor between this case and others cited by IAWC that have involved LCAs. *See, e.g., Tootsie Roll Indus. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers' Int'l Union*, 832 F.2d 81, 82-83 (7th Cir. 1987); *see also, e.g., Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 391 F.3d 613, 617-19 (5th Cir. 2004); *Boise Cascade Corp. v. Paper Allied-Industr., Chem. & Energy Workers, Local 7-0159*, 309 F.3d 1075, 1080 (8th Cir. 2002). None of these cases involved a pending challenge to the validity of the underlying agreement.

under the Agreement, except to contest the fact of what occurred." Any decision to the contrary, argues IAWC, exceeded the arbitrator's powers. In IAWC's eyes, because the LCA does not contain an *exception* for good-faith challenges to the agreement, Williams's termination was within its unambiguous terms and therefore beyond the scope of the arbitrator's review.

But IAWC misses the point. What matters is not whether this court believes the LCA language to be ambiguous, but whether *the arbitrator* found it ambiguous. As we have said: "[M]isinterpretation of contractual language, no matter how 'clear,' is within the arbitrator's powers; only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award." *Int'l Union of Operating Eng'rs, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004). Misinterpreting and ignoring a contract's language are two different things. *Id.* ("There is a big difference—a clear difference, a plain difference—between misunderstanding and ignoring contractual language."). Had the arbitrator found the LCA to be unambiguous and then proceeded to act contrary to its directions, i.e., *ignored* the contract, then IAWC's claims might have merit. *See, e.g., Tootsie Roll Indus.*, 832 F.2d at 84 (declining to look to the "law of the shop" when the dispositive contractual provision was unambiguous); *see also, e.g., Anheuser-Busch, Inc. v. Local Union No. 744, Affiliated with the Int'l Bhd. of Teamsters*, 280 F.3d 1133, 1139 (7th Cir. 2002) (stating that it was unnecessary for an arbitrator to look beyond the contract when its terms were unambiguous). But that is not what happened.

Here, the arbitrator found the LCA to be ambiguous. The LCA did not, by its terms, contemplate the current situation. In fact, the two aforementioned provisions—one giving IAWC the right to terminate Williams, the other giving Williams and the Union the right to challenge the agreement pursuant to the CBA—appeared to point in different directions. Despite IAWC's protestations to the contrary, the arbitrator did not ignore the LCA's language. Indeed, the LCA's "failure-to-comply" language is the only provision that the arbitrator quoted directly. Instead, the arbitrator interpreted that language in the context of the other language in the agreement and the situation with which he was confronted. As we said in *Ethyl Corp.*:

> [C]ontracts have implied as well as express terms, and the authority of an arbitrator to interpret a[n agreement] includes the power to discover such terms. Indeed, as long as a plausible solution is available within the general framework of the agreement, the arbitrator has the authority to decide what the parties would have agreed on had they foreseen the particular item in dispute.

768 F.2d at 186 (citation and quotations omitted).

The arbitrator did precisely this. He looked to the agreement, found it inconclusive, and then proceeded to interpret the contract to resolve the dispute. He concluded that the LCA contained an implied term that did not permit Williams's termination while a challenge to the LCA's validity was pending. The arbitrator offered the following statement summarizing his findings:

> Thus, considering generally accepted principles of contract interpretation; that contract language be interpreted against the drafter, that it be interpreted in harmony with external law, and that it be interpreted to avoid grossly unreasonable results; I find that the Last Chance Agreement does not permit the discharge of Mr. Williams for failure to comply with a provision of the Agreement while the validity of that provision is subject to a proper, good faith, non-frivolous challenge. Therefore, Mr. Williams's discharge violated the Last Chance Agreement.

This is not, as IAWC contends, "industrial justice." *See Enterprise Wheel & Car Corp.*, 363 U.S. at 597. Nor did the arbitrator "dress his policy desires up in contract interpretation clothing." *N. Ind. Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 347 (7th Cir. 2001); *see also Ethyl Corp.*, 768 F.2d at 187 (noting than an arbitrator cannot merely make "noises of contract interpretation" to shield his decision from judicial review). This is contract interpretation in its purest sense, and it is the task that the parties asked the arbitrator to perform. As such, we pass no judgment on the quality of that interpretation but instead defer to the arbitrator. Any conclusions to the contrary would run counter to the very idea of arbitration and undermine the dispute resolution system within which the parties have agreed to operate. *See Misco*, 484 U.S. at 37-38 (discussing the policies behind insulating arbitral decisions from judicial review); *J.H. Findorff & Son, Inc.*, 393 F.3d at 745 ("If a gaffe authorized a court to set aside the award, there would be little differ-

ence between arbitration and litigation other than the extra cost and delay of presenting the case to the arbitrator before taking it to court. That would turn arbitration on its head . . . .").

### III. CONCLUSION

The arbitrator interpreted what he perceived to be ambiguity within the LCA to address a situation that he concluded the contract did not contemplate by its express terms. For that reason, we AFFIRM the district court's decision granting summary judgment in favor of the Union and thereby confirm the arbitrator's award.