In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2913

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND
TRAINMEN, GENERAL COMMITTEE OF ADJUSTMENT,
CENTRAL CONFERENCE,

*Plaintiff-Appellant*,

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 07392—**Matthew F. Kennelly**, *Judge.*

ARGUED JANUARY 14, 2013—DECIDED JUNE 21, 2013

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and MILLER, *District Judge*.[*]

HAMILTON, *Circuit Judge.* A 1952 collective bargaining agreement still governs aspects of the employment of

[*] The Honorable Robert L. Miller, Jr. of the Northern District of Indiana, sitting by designation.

some members of plaintiff Brotherhood of Locomotive Engineers and Trainmen, including attendance and leave policy. In 2003 defendant Union Pacific Railroad adopted a new attendance policy. The union demanded arbitration under the Railway Labor Act, contending that the new attendance policy conflicted with the 1952 Agreement. An arbitrator found that Union Pacific's 2003 attendance policy did not conflict with the 1952 Agreement. The union then sued to vacate the arbitration award. The district court granted summary judgment against the union. *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 882 F. Supp. 2d 1032, 1042 (N.D. Ill. 2012). The union has appealed. It argues that the arbitrator exceeded his jurisdiction by failing to interpret the 1952 Agreement in his award. We affirm.

I.  *Standard of Review*

This court reviews the district court's decision on a motion for summary judgment *de novo*. *United Food & Commercial Workers v. Illinois-American Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009). In reviewing the award of an arbitrator acting under the terms of the Railway Labor Act, see 45 U.S.C. § 153 First (q), we apply one of the most deferential standards of judicial review in all of federal law. See *Lyons v. Norfolk & Western Ry. Co.*, 163 F.3d 466, 469 (7th Cir. 1999).

In enacting the Railway Labor Act, "Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-

employee disputes arising out of the interpretation of collective-bargaining agreements . . . . Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts." *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 94 (1978) (internal citations omitted). A reviewing court therefore may disturb an arbitration award only if the arbitrator did not comply with the Railway Labor Act, exceeded the arbitral jurisdiction, or committed fraud. *Id.* at 93; see also 45 U.S.C. § 153 First (q); *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 707 F.3d 791, 794-95 (7th Cir. 2013).

The only issue here is whether the Special Board of Adjustment arbitrator exceeded his jurisdiction. Arbitrators exceed their jurisdiction if they fail to interpret the collective bargaining agreements between the parties. *Lyons*, 163 F.3d at 469 ("To remain within the scope of its jurisdiction, the essence of the [arbitrator]'s decision must be contained in the terms of the agreement between the union and the employer."). They do not exceed their jurisdiction if they make a mistake in interpreting a collective bargaining agreement. Lawyers and judges who believe they see an error of reasoning or interpretation by an arbitrator are often tempted to try to correct such errors. Such error correction is not the function of judicial review of arbitration awards under the Railway Labor Act. That is why we have said many times that the question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk &*

*W. Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987); see also *United Food & Commercial Workers*, 569 F.3d at 754 ("An arbitrator's decision draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be.").

Arbitrators fail to interpret an agreement when they ignore the text of the agreement and instead rely on their own notions of justice. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) ("[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."). The law does not, however, ban arbitrators from considering the interests at stake and relevant policy goals in coming to their decisions. Thus the question for this court is whether the arbitrator interpreted the parties' collective bargaining agreement and reached a tenable result from the text of the agreement, not whether the arbitrator considered other factors in interpreting the agreement or erred in his interpretation. See *Amax Coal Co. v. United Mine Workers of America*, 92 F.3d 571, 575-76 (7th Cir. 1996); *Hill*, 814 F.2d at 1194-95.

II. *The Disputed Attendance Policy*

The union argues that the arbitrator exceeded his jurisdiction by failing to interpret the 1952 Agreement in determining whether the railroad could implement its 2003 attendance policy. The 1952 Agreement was signed

by the Missouri Pacific Railroad Company and two unions, including the plaintiff, which is now known as the Brotherhood of Locomotive Engineers and Trainmen. Union Pacific Railroad merged with the Missouri Pacific Railroad in 1982, and the agreement now binds Union Pacific. The 1952 Agreement has no expiration date.

To set the stage, we must first explain the term "lay-off" in the railroad business. The term refers not to involuntary terminations of employment, as in most industries, but to an employee's voluntary decision to take unpaid time off. Trains are dangerous, and employees who are not sufficiently healthy, alert, and fit for work can pose grave dangers to themselves and to many others. An employee who is not up to the work on a given day can do everyone a service by taking a day of unpaid leave. Along these lines, therefore, Section 1 of the 1952 Agreement states in relevant part: "When employees in engine service are permitted to lay off they must not be absent in excess of 30 days, except in case of sickness or injury, without having formal leave, in writing, granted in accordance with the provisions of this agreement." (Sections 2 through 5 of the 1952 Agreement impose limits on the terms and purposes of leaves of absences, as well as procedures for securing approval for certain types of leave.) The quoted language in Section 1 can be read as implying that employees have a right to take "lay-offs" of up to 30 days without explanation or consequence. That is not the only way to read it, though, as the arbitrator found.

In 2003, Union Pacific adopted a new attendance policy that addresses layoffs:

As a Union Pacific employee, you were hired for and are expected to protect your job assignment on a full-time basis. "Full-time" means being available to work your assignment, whether regular or extra, whenever it is scheduled to work. Assigned rest days, layover days, and agreement-provided compensated days off are available to you for personal business. In addition, reasonable personal lay-offs may be granted if the needs of service permit.

It is your responsibility to notify your manager, in advance of layoffs if possible, on personal or family issues that may affect your ability to work full time. Substantiating documentation is expected and may be required. However, notification and documentation alone do not excuse your responsibility to protect your job. You may be considered in violation of this policy regardless of the explanation offered if you are unable to work full time and protect all employment obligations.

Employees who violate the policy may be disciplined. The first two violations result in formal warnings. A third violation within 36 months of active service following the second violation results in dismissal. The railroad has disciplined engineers and other employees who it believed violated the policy by excessive absenteeism. The union objected to these actions, arguing that the attendance policy conflicted with the 1952 Agreement. The union has argued that the 1952 Agreement provides engineers with a right to lay off for 30 days, and that administering discipline for any absences previously

approved by the railroad's "crew caller" violates any possible reading of the 1952 Agreement.[1]

III. *The Arbitrator's Decision*

The arbitrator determined that the 1952 Agreement did not prevent the railroad from adopting its new attendance policy. He concluded that the 1952 Agreement did not provide automatic permission for lay-offs or absences that lasted thirty or fewer days. In reaching this conclusion, the arbitrator worked through the language of the 1952 Agreement. He determined specific meanings of words and phrases from Section 1, including the terms "thirty days," "permitted," and "sickness and injury."

The arbitrator referred to the prior practice of the union employees who requested permission from the crew caller to take time off from work as evidence of the proper interpretation of the 1952 Agreement. He also considered the interests of the parties in this dispute, noting that while engineers work long hours and accidents from fatigue are "a serious concern," employers have a strong interest in ensuring employees are available for work and are not absent excessively. In addition, the arbitrator considered two other arbitration awards but acknowledged that those awards did not bind him.

---

[1] A crew caller handles short-term scheduling needs, including ensuring that needed crews are available and approving or rejecting lay-off requests.

Ultimately, the arbitrator found that the 1952 Agreement created only a procedure for requesting leave and did not give railway employees substantive rights beyond the right to ask permission to lay off. The arbitrator therefore found that the railroad's attendance policy does not conflict with the 1952 Agreement. The arbitrator did find, however, that one aspect of the railroad's attendance policy was unreasonable. He concluded that the railroad's use of an average number of missed days of all employees as a yardstick for determining individual absenteeism would be arbitrary and unreasonable because this average would be subject to change without notice to employees and would place as many as half of the employees in possible violation of the attendance policy at any given time. He therefore ruled that the railroad may not use average missed days to determine whether individual employees are in violation of the attendance policy.

After issuing the award, and upon request of the parties, the arbitrator issued a clarification on June 10, 2011 stating that employees can be disciplined under the railroad's policy regardless of their good or bad faith. Based on the railroad's arguments in the arbitration, though, the arbitrator explained that the railroad may not discipline employees if they lay off for cause (*e.g.*, for sickness, the occasional holiday or weekend, or for recurring issues with adequate justification). The arbitrator stated that the union could refer to his decision and use it to defend against any unfair future discipline.

IV. *The Union's Challenges to the Arbitrator's Decision*

The union focuses on two aspects of the 2003 attendance policy. First, it argues that the policy violates the right to be absent for thirty or fewer days, which it argues was conferred by the 1952 Agreement. Second, the union complains that the railroad can discipline employees under the 2003 attendance policy even for absences that have been permitted by a crew caller. The union argues that this discipline policy is unfair and conflicts with the 1952 Agreement, and that the arbitrator exceeded his jurisdiction by failing to interpret the 1952 Agreement in approving the railroad's new policy.

On appeal, the union presents these challenges in three variations. It claims that the arbitrator's award should be rejected because it (1) nullified the essential meaning of Section 1 of the 1952 Agreement, (2) lacked an "interpretive route" from the 1952 Agreement, and (3) was improperly based on policies and arguments outside of the 1952 Agreement. However reasonable the union's position might have been before the arbitrator, these arguments on the merits do not persuade us to vacate the arbitrator's award under our deferential standard of review.

A. *Nullification of the 1952 Agreement*

The union believes that the 1952 Agreement must offer some protection to engineers who desire to lay off from work. Because the arbitrator found that the 1952 Agreement merely created a procedure for formal leave and

did not give such protection to engineers, the union argues that the arbitrator took away all critical meaning of the 1952 Agreement and thus must not have interpreted it.

The arbitrator did not nullify Section 1 of the 1952 Agreement. He simply interpreted the agreement to mean something other than the meaning promoted by the union, and in doing so, he certainly interpreted its language. He quoted the relevant language from Section 1 and considered that language and meaning in the course of explaining his award. For example, the arbitrator found that Section 1's reference to "thirty days" must mean consecutive days (not total days); that Section 1's reference to "sickness or injury" means that leaves longer than thirty days for sickness or injury do not require the formal leave request procedure; and that "'permitted' is used to focus on the Carrier's reserved judgment" and as a "condition precedent" to laying off, considering the grammatical effects of the term's surrounding phrases. By looking to the meaning of specific words and phrases and determining those definitions based on surrounding language, the arbitrator interpreted the 1952 Agreement in his decision, even if the Union is unhappy with the result.

B. *Lack of Interpretive Route to the Award*

The union next argues that although the arbitrator quoted and cited the contract, his award still exceeded his jurisdiction because there is no interpretive route from the contract to the award. Because the arbitrator

found that the 1952 Agreement does not provide rights to lay off for thirty days and does allow for later discipline for permitted absences, at least if there is a pattern of excessive absence, the union argues that the arbitrator must not have interpreted the 1952 Agreement. First, the union states that the arbitrator must have defined the terms "lay-off" and "absent" differently, and it asserts this interpretation is "comical." The union explains that this interpretation produces absurd results, such as that an engineer could simultaneously have permission to lay off but no permission to be absent for longer than thirty days, and thus would be both required and not required to work on the same day. In sum, the union claims it would be unfair to allow an employee to be punished for an absence that was permitted by the crew caller at the time the absence was requested, and thus any arbitral award coming to this result must not have arisen from interpretation of the 1952 Agreement. Second, the union claims that the arbitrator stated that the 1952 Agreement conferred on engineers only the right to ask for permission to lay off. The union argues that this supposed right is so trivial that it is not a reasonable interpretation that can be traced back to the 1952 Agreement.

These arguments lose sight of this court's limited standard of review. They invite us to consider the merits of the arbitration award, which we may not do. The only question for this court is whether the arbitrator interpreted the award. Our task is limited to determining whether the arbitrator's award could possibly have

been based on the contract. *Amax Coal Co.*, 92 F.3d at 577 ("[W]e must insist on the enforcement of [the arbitrator's] decision if there is any possible interpretive path from . . . the Agreement to the arbitrator's resolution of this case."); *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 184-85 (7th Cir. 1985) ("It is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to draw its essence from the collective bargaining agreement. . . .") (internal quotation omitted).

In making its first argument, the union fails to show how the arbitrator's conclusion that permitted absences could result in discipline is an impossible interpretation of the 1952 Agreement. The district court aptly explained that individual absences may be permitted by the crew caller, who makes lay-off decisions based on the needs of the railroad at that time, but that an employee's total absences may later reveal a pattern of abuse. Consequently, even if the crew caller permitted each of the lay-offs in question, the employee may still be excessively absent and subject to discipline. *Bhd. of Locomotive Eng'rs & Trainmen*, 882 F. Supp. 2d at 1037. The arbitrator's view may or may not be the best reading of the 1952 Agreement, but he was certainly reading the 1952 Agreement. The union's argument also misses the mark because its characterizations of the arbitrator's interpretations are inaccurate. The arbitrator's reading of the 1952 Agreement does not require that the terms "lay-off" and "absence" be interpreted differently, but rather that the time period of the absence (shorter or longer than thirty

days) triggers different procedures (either mere permission or formal leave).

The union's second argument fails as well because it does not show why it was impossible for the arbitrator to conclude that the 1952 Agreement, which sets out the procedures for formal leave, conferred on employees only the right to ask permission for leave. The arbitrator considered the words, phrases, and grammar of the 1952 Agreement to reach his conclusion that the purpose of this language was to create leave procedures and not to confer substantive rights on the employees to be absent at will, without consequence or explanation, for up to thirty days at a time. This interpretation may or may not be correct, but it is not untethered from the agreement's text. The arbitrator's award was not so detached from the 1952 Agreement as to permit a finding that there was no interpretive route from the agreement to the award.

## C. *Consideration of Policies Outside the 1952 Agreement*

The union next argues that the arbitrator based his award on policies outside the 1952 Agreement and thus exceeded his jurisdiction. It contends that the arbitrator based his decision not on the 1952 Agreement but on his own notion that the railroad had an "inherent right to control the attendance of its employees." The arbitrator discussed this issue to determine whether the railroad could develop an attendance policy at all, and he found the railroad could do so because of this "inherent" managerial right. The arbitrator's next question was there-

fore whether this general right had been contracted away by the 1952 Agreement and thus whether the current policy conflicted with that agreement. See generally *Chicago & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 153 (7th Cir. 1990) (management may take certain actions because of a prerogative right or because of contract, so long as those things do not conflict with the collective bargaining agreement). Arbitrators may consider more general policies and norms in determining the meaning and implications of the agreements they interpret. See *Ethyl Corp.*, 768 F.2d at 185 (reversing district court's decision vacating award; arbitrator could apply a "traditional principle of contract law"). The arbitrator did not exceed his jurisdiction here by contemplating this managerial right in addition to interpreting the 1952 Agreement.

The union makes another, more laborious argument that the arbitrator exceeded his jurisdiction by quoting the railroad in his award, rather than focusing on the 1952 Agreement's words alone. Essentially, the union argues that the arbitrator referred to his own notions of justice when he attempted to create an arbitral equivalent of judicial estoppel by referring to positions the railroad had taken in its arbitration brief. In defending the attendance policy, the railroad said the policy was not designed to punish or prohibit occasional absences or laying off for sickness or even for a weekend or a holiday, or even for recurring absences that are justified: "It is only employees who are repeatedly or regularly absent without cause or who otherwise abuse the lay off process that run afoul of the Policy. It is, in other

words, a policy designed to prohibit only *excessive* ab-
senteeism, not all absenteeism across the board." The
arbitrator quoted the railroad's interpretation and stated
that the union could later refer to the award itself to
hold the railroad to that liberal interpretation of the
policy. App. 49 ("These words are hereby memorialized
and may forever be referred to by the Organization in
defense of employees who it deems are unfairly sub-
jected to discipline under the 2006 TE&Y Attendance
Policy."). In this instance, the arbitrator interpreted
the attendance policy — a necessary step for deter-
mining whether the policy conflicts with the 1952 Agree-
ment — and chose to adopt the railroad's interpretation,
while also indicating that the railroad should be held
in the future to its relatively liberal interpretation of
its policy upon which the arbitrator relied. Once more,
the arbitrator did not exceed his jurisdiction here.

### D. *Incorrect and Unclear Interpretation by the Arbitrator*

The union's remaining arguments pertain to how the
arbitrator interpreted the 1952 Agreement, not whether
he did so. In particular, the union argues (1) that the
arbitrator did not properly interpret a past arbitration
award; (2) that the arbitrator failed to consider evidence
about the parties' past practices that tended to support
its interpretation of the 1952 Agreement, while he con-
sidered other facts that tended to undermine its inter-
pretation; and (3) that the arbitrator did not adopt the
correct interpretation of Section 1 of the 1952 Agreement,
and he should have found that Sections 2 through 5

concern formal leave, while Section 1 does not. For the reasons we have already noted, all three of these arguments are non-starters in light of the deferential standard for judicial review. See, *e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 522 F.3d 746, 754-55 (7th Cir. 2008) (arbitrators "are not bound by the outcome of prior decisions in the same way that judges are bound by the doctrine of *stare decisis* in courts"); *Bates v. Baltimore & Ohio R.R. Co.*, 9 F.3d 29, 32 (7th Cir. 1993) (plaintiff's contention that board improperly relied on an inauthentic document was "an evidentiary dispute [that] does not fall within any of the narrow jurisdictional grounds for review under 45 U.S.C. § 153 First (q)"); *Hill*, 814 F.2d at 1197 ("[T]he judicial function in arbitration cases is at an end when the court is satisfied that the arbitrators were interpreting the contract rather than doing something else. The correctness of their interpretation is irrelevant.").

Finally, the union complains that the arbitrator's award and clarification are unclear and leave the parties unsure of how to act in absence and leave situations. While lack of clarity can create problems for parties in arbitration, this court is not the venue for clarifying an arbitration award. Under the Railway Labor Act, the Special Board is charged with interpretations of arbitration awards, so this issue will not be considered further here. 45 U.S.C. § 153 First (m); *Bhd. Ry. Carmen Div. v. Atchison, Topeka & Santa Fe Ry. Co.*, 956 F.2d 156, 160 (7th Cir. 1992) ("[T]he judicial duty to enforce an arbitration award . . . is neither a duty nor a license to interpret it.") (internal citation omitted); see also *Bhd. of Maintenance of*

*Way Emps. v. Burlington Northern R.R. Co.*, 24 F.3d 937, 939-41 (7th Cir. 1994) (reversing district court's decision interpreting arbitration award).

The judgment of the district court is AFFIRMED.