In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-3402

UNITED STATES SOCCER FEDERATION, INC.,

*Plaintiff-Appellant*,

*v.*

UNITED STATES NATIONAL SOCCER TEAM PLAYERS
ASSOCIATION,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 9899 — **Virginia M. Kendall**, *Judge*.

ARGUED MARCH 31, 2016 — DECIDED SEPTEMBER 22, 2016

Before MANION and KANNE, *Circuit Judges* and PEPPER,
*District Judge*.*

KANNE, *Circuit Judge*. Soccer is called "the beautiful
game,"[1] but the collective-bargaining process behind the

---

* The Honorable Pamela Pepper, United States District Court for the
Eastern District of Wisconsin, sitting by designation.

sport can be ugly. This case matches Plaintiff United States Soccer Federation, Inc. ("US Soccer Federation"), the national governing body for soccer in the United States, against Defendant United States National Soccer Team Players Association ("Players Association"), the labor union for members of the Men's National Team, in a dispute over their current collective bargaining agreement ("CBA") and uniform player agreement ("UPA" and collectively with CBA, "CBA/UPA").

The present case kicked off in 2013, when the Players Association disapproved the US Soccer Federation's proposed tequila poster advertisement, which contained player images. Counterattacking, the US Soccer Federation issued a notice, declaring that the CBA/UPA does not require Players Association approval for use of player likenesses for six or more players in print creative advertisements by sponsors, based on the express terms of the agreement. Crying foul, the Players Association filed a grievance and demanded arbitration, arguing that the CBA/UPA does require this, based on the past practice of the parties.

The arbitrator issued an award in favor of the Players Association. The district court confirmed the arbitrator's award and granted summary judgment for the Players Association. The US Soccer Federation appealed. We reverse.

---

(…continued)

[1] PELÉ WITH ROBERT L. FISH, PELÉ, MY LIFE AND THE BEAUTIFUL GAME (1977).

## I. BACKGROUND

We begin with a brief synopsis of the relevant provisions of the CBA/UPA for this case. Then, we summarize the pertinent factual background and procedural history.

### A.  Key Provisions in the CBA/UPA

Since 1997, US Soccer Federation and the Players Association have negotiated and executed four CBAs. The current CBA was established in 2011, revised in 2013, and expires in 2018. (R. 41 Ex. B [hereinafter CBA].)

Article IV of the CBA incorporates the UPA, which binds all members of the Players Association, including the Men's National Team. (R. 41 Ex. B [hereinafter UPA].)

The current CBA/UPA is constrained by integration and no-modification clauses, as well as a non-waiver provision.[2] The integration and no-modification clauses provide that the CBA/UPA is "deemed the complete agreement between the parties" and "no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought." UPA § 13(a); CBA § 7.1. The non-waiver provision states that "failure of either party to insist, in any one or more instances, on the performance of any terms or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted" by the CBA/UPA. UPA § 13(c).

---

[2] The integration clause is also called a merger clause or zipper clause.

Article V of the CBA outlines the grievance and arbitration procedure for resolving disputes arising from the "interpretation or application of, or compliance" with the CBA/UPA. The scope of the arbitrator's authority is expressly delineated:

> The decision of the Impartial Arbitrator will constitute full, final and complete disposition of the grievance, as the case may be, and will be binding upon the Player(s) involved and the parties to this Agreement; provided, however, that the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any Uniform Player Agreement. Furthermore, the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of any exhibit to this Agreement or any exhibit to the Uniform Player Agreement unless there is a conflict or inconsistency between the provisions of the exhibit and this Agreement or any Uniform Player Agreement, in which case the Impartial Arbitrator may conform the exhibit to this Agreement or the Uniform Player Agreement. In resolving grievances, the Impartial Arbitrator has the authority to interpret, apply and determine compliance with any provision of this Agreement, or Uniform Player Agreement or exhibit thereto and to award monetary damages and/or declaratory or injunctive relief.

CBA § 5.8. In short, an arbitrator "has the authority to interpret, apply and determine compliance with [the CBA/UPA]," but he cannot "add to, subtract from, or alter in any way the provisions of [the CBA/UPA]." *Id*.

Finally, the substantive provision at issue in this case is Section 6 of the UPA, which governs the use of player likenesses taken or created during US Soccer Federation activity. Under Section 6(b), "[e]xcept as set forth below, [the US Soccer Federation] may not use or allow others to use Player's Likeness without the agreement of Player or Player's representative." One such exception occurs in Section 6(f)(i), which governs sponsor use of player likenesses for groups of six or more players:

> Six or More Players – Use by Federation Sponsor. If Player's Likeness is used by a "Partner" of the Federation (as defined in 6(h)[3]) for any Non-commercial Use or in a Partner's advertising or promotions, and if the advertising, promotion, or Non-commercial Use includes six (6) or more members of any Federation national team (*e.g.,* team poster or collage), Federation will request, but not require, the Partner to make a contribution in an amount to be determined in the Partner's sole and absolute discretion to the applicable Player Pool(s), provided however, with respect to any use by a Partner in a 'Spot' (as defined in 6(h)[4]), prior to such use, Federation shall provide a copy of such Spot to the Players Association for its approval, which approval shall be considered in good faith.

---

[3] Section 6(h) defines "Partners" as "sponsors or partners of [the US Soccer Federation].

[4] Section 6(h) defines "Spots" as "video commercial spots (which includes videos to be broadcast or disseminated or posted in any medium including television commercials)."

> Such uses by Partners specifically exclude any Li-
> censing Purposes.

Section 6(f)(i) divides the use of player likenesses into two categories: (1) *non-Spot*, which includes non-commercial video and print creatives, and (2) *Spot*, which is defined as commercial video. For non-Spot advertisements, Section 6(f)(i) provides that the US Soccer Federation "will request, but not require" a sponsor donation to a player pool. For Spot advertisements, Section 6(f)(i) provides that the US Soccer Federation "shall provide a copy of such Spot to the Players Association for its approval."

### B.  Factual Background and Procedural History

From approximately 2001 until 2013, the US Soccer Federation voluntarily submitted print creatives to the Players Association for review, before authorizing sponsor use.

In 2013, the Players Association disapproved a proposed print creative submitted by the US Soccer Federation—a poster advertisement for el Jimador, a popular mid-shelf tequila brand. The US Soccer Federation initially responded by filing a grievance and demanding arbitration under the CBA/UPA, but later withdrew the action. On February 20, 2014, the US Soccer Federation issued a declaration to the Players Association, stating that it had "no contractual obligation to submit print/digital creative pieces containing the likeness of six (6) or more national team players to the Players Association (PA) for its advance approval" and would no longer be doing so in the future. (R. 44 at 11.)

On February 27, 2014, the Players Association filed a grievance and demanded arbitration under the CBA/UPA,

claiming that the US Soccer Federation's declaration consti-
tuted an anticipatory breach of the CBA/UPA.

Following six days of hearings, on September 12, 2014,
the arbitrator found for the Players Association, framing the
issue before him as follows:

> Whether the United States Soccer Federation, under
> the terms of the Collective Bargaining Agreement
> and the Uniform Players Agreement, is required by
> the terms of the Agreements or past dealings be-
> tween the parties to submit to the United States Na-
> tional Soccer Team Players Association for its ad-
> vance review and approval non-video print and
> digital creatives containing the likenesses of six (6)
> or more players to be used by [the US Soccer Fed-
> eration] or its sponsors in noncommercial or adver-
> tising and promotional materials?

(R. 41-7 at 5–6.)

Opening his discussion, the arbitrator declared that "an
arbitrator only needs to construe the meaning of a collective
bargaining agreement when the contract language is indefi-
nite or ambiguous." (*Id.* at 19.) He continued, "[i]f the lan-
guage is clear and unambiguous, meaning the ordinary
reading of the language cannot reasonably be construed
with more than one meaning, arbitrators will apply its plain
meaning and not look outside the four-corners of the con-
tract to ascertain the intentions of the parties." (*Id.*)

Turning to the CBA/UPA, the arbitrator asserted that the
agreement "makes clear that there is no specific contractual
provision that requires [the US Soccer Federation] to submit
print creatives of six (6) or more players to the Players Asso-
ciation for its approval." (*Id.* at 21.) Then, he determined that

the CBA/UPA is "silent as to this point" because "[t]here is no explicit contract language that requires [the US Soccer Federation] to submit to such an approval process, just as there is no language laying out another process for the review of print creatives." (*Id.*) Additionally, the arbitrator noted that "the UPA clearly contemplates that [the US Soccer Federation's] sponsors might make use of print creatives." (*Id.*)

After acknowledging that he cannot create "new rights in the parties' CBA/UPA," the arbitrator determined that the agreement was ambiguous and interpreted it in accordance with the parties' past practice:

> It is the role of the Impartial Arbitrator to interpret the meaning of the contract when there is ambiguity, as there is here when the contract is silent as to the procedure for the approval of print creatives submitted by sponsors, which Section 6 of the UPA certainly anticipates. … [O]ne cannot ignore that [the US Soccer Federation] has openly and repeatedly forwarded print creatives to the Players Association for its review and approval for more than a decade. It would defy sound judgment to draw a conclusion as to the intent of the parties by considering only actions they did <u>not</u> take but refusing to look squarely at actions they did take. The arbitrator's only goal is to shed light on the intent of the parties, which may be reflected by their actions and a mutually acted upon custom or past practice, which is perhaps the most widely used standard or lens relied upon by arbitrators to interpret contractual ambiguity.

(*Id.* at 40.) Continuing, the arbitrator found that his consideration of the parties' past practice did not violate the CBA/UPA's arbitration, integration, and no-modification provisions because he was interpreting the contract by resolving an ambiguity. (*Id.* at 52–53.) In conclusion, the arbitrator held that "[t]he long-standing practice of submitting print creatives to the Players Association for its approval is an implied term of the CBA/UPA by virtue of a bona fide past practice" and entered an award in favor of the Players Association. (*Id.* at 53.)

Subsequently, the US Soccer Federation filed suit in federal district court to vacate the arbitrator's award, pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, arguing that the arbitrator exceeded his authority by relying on the parties' past practice instead of the express terms of the CBA/UPA. The Players Association counterclaimed for enforcement of the award. Both parties moved for summary judgment.

On September 29, 2015, the district court denied the US Soccer Federation's motion and granted the Players Association's motion, confirming the arbitrator's award. *United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, 140 F. Supp. 3d 738, 741 (N.D. Ill. 2015). The district court began by "emphasizing its extremely limited authority to review the decisions of arbitrators." *Id.* at 747. The district court found that the "arbitrator considered the CBA/UPA, interpreted the CBA/UPA, and reached a conclusion. He did exactly what the parties bargained for under the CBA/UPA." *Id.* at 748. The district court explained that although "the arbitrator did not expressly state that the agreement's silence on this point created an ambiguity" and "the

arbitrator's interpretation may have been unsound, at times invoking the terms 'silence' and 'ambiguity' far too cavalierly," this was "not enough" to overturn the award under the applicable standard of review. *Id.* at 749–50. Accordingly, the district court could not conclude "that the arbitrator's reliance on past practice fell outside his authority to interpret and apply the terms of the parties' CBA/UPA." *Id*. at 750. The US Soccer Federation appealed.

## II. ANALYSIS

This court reviews "*de novo* a district court's decision on cross-motions for summary judgment, meaning that we review the arbitrator's decision as if we were the court of first decision." *United Food & Commercial Workers, Local 1546 v. Illinois Am. Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009) (citations omitted).

"Judicial review of arbitration awards is extremely limited." *Johnson Controls, Inc., Sys. & Servs. Div. v. United Ass'n of Journeymen*, 39 F.3d 821, 824 (7th Cir. 1994) (collecting cases). The Supreme Court has held that, "[a]s long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' … the award is legitimate." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (quoting *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). In other words, the question presented to "a federal court asked to set aside an arbitration award … is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987).

Judicial deference to arbitration, however, is not unlimited. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Enter. Wheel & Car Corp.*, 363 U.S. at 597. "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* A court is empowered to vacate an arbitrator's award if "the arbitrator had exceeded the powers delegated to him by the parties." *Dexter Axle Co. v. Int'l Ass'n of Machinists*, 418 F.3d 762, 768 (7th Cir. 2005) (citing *Enter. Wheel & Car Corp.* 363 U.S. at 597 and *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985)). Because the arbitrator is typically limited to interpreting the contract, if "there is no possible interpretive route to the award," then a "noncontractual basis can be inferred and the award set aside." *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505–06 (7th Cir. 1991).

On appeal, the US Soccer Federation argues the arbitrator's award should be vacated. Specifically, it argues that, with regard to sponsor use in print creatives of player likenesses for six or more players, the terms of the CBA/UPA are clear and unambiguous and the arbitrator exceeded his authority in interpreting the agreement to require Players Association approval, based on past practice. We agree.

As an initial matter, the arbitrator erred in his determination that "there is ambiguity … here when the contract is silent as to the procedure for the approval of print creatives submitted by sponsors, which Section 6 of the UPA certainly anticipates." (R. 41-7 at 40.)

This court has defined "ambiguity," in a collective bargaining agreement context, as "something that makes it possible to interpret a document reasonably in more than one way," *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 542 (7th Cir. 2000); *see also Young v. N. Drury Lane Prods., Inc.*, 80 F.3d 203, 205 (7th Cir. 1996) ("[w]e must enforce the terms of a collective bargaining agreement when those terms are unambiguous … [i]f the language of such an agreement lends itself to one reasonable interpretation only, it is not ambiguous."). Furthermore, this court has held that "there must be either contractual language on which to hang the label of ambiguous or some yawning void … that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993).

Here, the arbitrator erred. We echo the district court's observation that the arbitrator "at times invoke[ed] the terms 'silence' and 'ambiguity' far too cavalierly." *United States Soccer Fed'n*, 140 F. Supp. 3d at 749. Contrary to the arbitrator's determination, the CBA/UPA is *not silent* as to the approval procedure for sponsor use of print creatives: the agreement explicitly provides that, for sponsor use of print creatives with player likenesses for six or more players, the US Soccer Federation "will request, but not require, the [sponsor] to make a contribution … to the applicable Player Pool(s)." UPA § 6(f)(i). Moreover, the applicable terms of the CBA/UPA are clear and unambiguous because they can be *reasonably* construed only in one way—that the US Soccer Federation "will request, but not require" a sponsor contribution to a player pool. There is no other reasonable interpretation, much less one that includes a requirement for Players Association approval. In other words, with regard to

sponsor use of print creatives in the CBA/UPA, there is no "yawning void" or "contractual language on which to hang the label of ambiguous." *Bidlack,* 993 F.2d at 608. And the arbitrator's determination of ambiguity, as well has his ensuing interpretation based past practice, "add[ed] terms to a contract that is plausibly complete without them." *Id.*

For context, we provide a more detailed discussion of the relevant provisions of the CBA/UPA. As discussed, Section 6(f)(i) of the UPA separates sponsor use of the likenesses of six or more players into two categories: (1) non-Spot, which includes non-commercial video and print creatives, and (2) Spot, which is defined as commercial video. For non-Spot advertisements, Section 6(f)(i) expressly states that the US Soccer Federation "will request, but not require" a sponsor contribution to the applicable player pool. In contrast, for Spot advertisements, Section 6(f)(i) expressly declares that the US Soccer Federation "shall provide a copy … to the Players Association for its approval." Immediately subsequent, Section 6(f)(ii), provides an explanation for the Spot "approval" requirement—"[w]ith respect to Spots, the Players Association has expressed concern that there is a greater likelihood of an impermissible implied endorsement in Spots." The Spot "approval" requirement is then confirmed in Section 6(h), which governs Spot advertisements for five or more players—"[n]otwithstanding any other provision in this Agreement, the Players Association shall approve video commercial spots."

These contractual provisions are clear and unambiguous, establishing that the parties contemplated and anticipated the use of player likenesses for six players or more in both non-Spot and Spot mediums. First, for non-Spot advertise-

ments, the parties agreed *only* to "request, but not require" a sponsor contribution to the applicable player pool, nothing more or less. And the CBA/UPA contain no other terms that contradict this "request, but not require" condition for non-Spot advertisement. Second, for Spot advertisements, the parties agreed *only* to "approval" by the Players Association, nothing more or less. Not only do Sections 6(f)(ii) and 6(h) confirm the "approval" requirement for Spot advertisements, but neither provision suggests extension of this requirement to non-Spot advertisements.

To recap, the relevant provisions of the CBA/UPA are clear, unambiguous, and *not silent* because they expressly provide that for non-Spot advertisements, which include print creatives, the US Soccer Federation "will request, but not require" a sponsor contribution to the applicable player pool. UPA § 6(f)(i). There is no basis for any other interpretation and thus "no possible interpretive route to the award" that requires Players Association approval. *Chicago Typographical Union*, 935 F.2d at 1506.

Having established that the relevant provisions of the CBA/UPA governing sponsor use of print creatives are clear and unambiguous, it easily follows that the arbitrator "exceeded the powers delegated to him by the parties." *Ethyl Corp.*, 768 F.2d at 184. The CBA/UPA expressly provides that the arbitrator "will not have the … authority to add to, subtract from, or alter" the agreement. CBA § 5.8. Therefore, the arbitrator exceeded his authority by interpreting the CBA/UPA to require Players Association approval for print creatives, even though the agreement's clear and unambiguous terms include only to "request, but not require" a sponsor donation to a player pool, UPA § 6(f)(i).

The present case is analogous to our decisions in *Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81 (7th Cir. 1987) and *Anheuser-Busch, Inc. v. Beer Workers Local Union 744*, 280 F.3d 1133 (7th Cir. 2002).

In *Tootsie Roll*, in a dispute between an employer and an employee fired for excessive absenteeism, the arbitrator issued an award for the employee, applying the employer's more lenient "general absenteeism policy," even though the employee had specifically entered into a stricter "letter agreement." 832 F.2d at 85. The district court vacated the award and this court affirmed. This court held that the arbitrator "failed to follow the clear requirements of the agreement" and noted that "if the parties had intended the regular policy to apply, there would have been no reason for spelling out the very specific … requirements contained in the letter agreement." *Id.* at 84. The *Tootsie Roll* court further held that "the law of the shop cannot be relied upon to modify clear and unambiguous provisions."[5] *Id.* Applying this principle, this court concluded that the letter agreement "is unambiguous and a deliberate modification of the general absenteeism policy" and that the "arbitrator inappropriately applied the law of the shop to [the letter agreement] to alter its clear meaning and impact." *Id.*

In *Anheuser-Busch*, in a collective bargaining agreement dispute between an employer and a union over the applicable commission rate, the arbitrator issued an award for the union, adopting a previous agreement's one-tier commission

---

[5] The "law of the shop" refers to "the body of past practices between the parties." *Tootsie Roll Indus.*, 832 F.2d at 84.

structure because of past practice, even though the current agreement contained a two-tier commission structure, as well as a zipper (or integration) clause. 280 F.3d at 1135–37. The district court upheld the award, and this court reversed. This court declared that "this contract required no interpretation: the zipper clause was unambiguous; the arbitration clause was unambiguous; and the commission-rates clause was unambiguous." *Id.* at 1140. The *Anheuser-Busch* court also noted that "[c]arefully written, well-reasoned, and thoroughly negotiated contracts are presumptively complete" and "[t]he conduct of the parties is absolutely irrelevant in situations like this involving a dual zipper-clause-arbitration clause." *Id.* at 1141. Ultimately, the *Anheuser-Busch* court held that "the contract was clear and unambiguous and needed no interpretation. Accordingly, we are convinced that the *arbitrator, not the parties, modified the contract and thereby exceeded his authority.*" *Id.* at 1142; *see also id.* at 1145 (Rovner, J. concurring) (writing that "[t]he unambiguous terms of [the current] agreement also barred the arbitrator from looking to practices pre-dating the agreement … as a source of new or modified contract terms").

The principles that govern *Tootsie Roll* and *Anheuser-Busch* also control the present case. Like in *Tootsie Roll*, here, the "law of the shop cannot be relied upon to modify clear and unambiguous provisions" of the CBA/UPA, which provide only for the US Soccer Federation to "request, but not require" a sponsor donation to a player pool for the use of print creatives. 832 F.2d at 84. Similar to *Anheuser-Busch*, in this case, the CBA/UPA "required no interpretation: the zipper clause was unambiguous; the arbitration clause was unambiguous; and the [substantive provision at issue] was unambiguous" and therefore the arbitrator "*rewrote the contract*

*and inscribed his own language upon the contract; something that he was not authorized to do."* 280 F.3d at 1140. In both *Tootsie Roll* and *Anheuser-Busch*, this court vacated the arbitrators' awards because they ignored and contradicted the clear and unambiguous terms of the underlying agreements. And here, we vacate this award for the same reasons.

In defense of the arbitrator's ambiguity determination, the Players Association contends the following: the arbitrator, not the court, determines whether the contract language is ambiguous and "only a decision to ignore or act contrary to language that the arbitrator [himself] found … to be ambiguous and binding would allow the Court to vacate an award." (Appellee Br. 26 (internal citations and quotations marks omitted).) For support, the Players Association relies primarily on *International Union of Operating Engineers, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742 (7th Cir. 2004) and *United Food & Commercial Workers, Local 1546 v. Illinois Am. Water Co.*, 569 F.3d 750 (7th Cir. 2009).

The Players Association's contention is overly broad. Such a sweeping rule would undercut any meaningful judicial review of arbitrator awards that "dispense [the arbitrator's] own brand industrial justice." *Amax Coal Co. v. United Mine Workers of Am.*, 92 F.3d 571, 575 (7th Cir. 1996). According to the Players Association, so long as the arbitrator declared that the agreement was ambiguous and did not contradict his own statement, then his award is completely insulated from judicial review. Such a result, however, runs contrary to this court's well-established holding that "the arbitrator cannot dress his policy desires up in contract interpretation clothing." *Northern Indiana Public Service Co. v. United Steelworkers of America*, 243 F.3d 345, 347 (7th Cir. 2001); *see*

*also Ethyl Corp.*, 768 F.2d at 187 ("This is not to say that simply by making the right noises—noises of contract interpretation—an arbitrator can shield from judicial correction an outlandish disposition of a grievance.").

Moreover, the Players Association's reliance on *International Union of Operating Engineers* is misplaced. In *International Union of Operating Engineers*, in a collective-bargaining dispute between an employer and union of engineers, the arbitrator issued an award in favor of the employer, after concluding that under the agreement, use of skid-steer loaders was not exclusive to the engineers. 393 F.3d at 744. The district court vacated the arbitrator's award, finding that the arbitrator "neglected the collective bargaining agreement's plain language." *Id*. This court reversed, holding that "misinterpretation of contractual language, no matter how 'clear,' is within the arbitrator's powers; only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award. There is a big difference—a clear difference, a plain difference—between misunderstanding and ignoring contractual language." *Id.* at 745.

*International Union of Operating Engineers* is inapplicable to the present case because here, the arbitrator ignored, rather than misunderstood, the express terms of the CBA/UPA. As discussed, for sponsor use of print creatives, the CBA/UPA provides for the US Soccer Federation to "request, but not require" a sponsor donation to a player pool. The arbitrator, however, determined that the CBA/UPA was "silent" as to the approval process for print creatives. This is the very definition of "ignoring contractual language." *Id.* at 745. In comparison, an example of the arbitrator "misunderstanding" contractual language would be if he had deter-

mined that print creatives required a mandatory sponsor payment. We have held that, "[t]here is a big difference … between misunderstanding and ignoring contractual language," *id.*, and in the present case, the arbitrator ignored, rather than misunderstood, the contractual language because he determined that the CBA/UPA was "silent" with regard to the procedure for print creatives, even though the agreement expressly provides that the US Soccer Federation "request, but not require" a donation to a player pool. And then he impermissibly "add[ed] to, subtract[ed] from, or alter[ed]" the CBA/UPA by requiring Player Association approval for sponsor use of print creatives. CBA § 5.8.

Nor does *United Food & Commercial Workers* support the Players Association's contention. In *United Food & Commercial Workers*, in an employment contract dispute between an employer and union over a terminated employee, the arbitrator issued an award in favor of the union, after concluding that the contract, called the last chance agreement ("LCA"), did not provide for the employee's termination in the circumstance of a good-faith challenge to the LCA itself. 569 F.3d at 753. The district court and this court confirmed the arbitrator's award. This court held that "[t]he arbitrator did not disregard the contractual language … [i]nstead, the arbitrator confronted a situation that was not expressly contemplated by the parties, interpreted the agreement, and reached a conclusion." *Id.* at 755. This court further held that "[w]hat matters is not whether this court believes the LCA language to be ambiguous, but whether *the arbitrator found it ambiguous* … only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award." *Id.* at 755–56 (citing *Int'l Union of Operating Eng'rs*, 393 F.3d at 745).

*United Food & Commercial Workers* is also inapplicable to
the instant case. There, the arbitrator's ambiguity determina-
tion rested on the fact that the situation "was not expressly
contemplated by the parties." 569 F.3d at 755. In contrast,
here, as the arbitrator acknowledged, "the UPA clearly con-
templates that [the US Soccer Federation's] sponsors might
make use of print creatives." (R. 41–7 21.) Indeed, the same
underlying facts of the present case distinguish it from both
*International Union of Operating Engineers* and *United Food &
Commercial Worker*—here, parties clearly contemplated spon-
sor use of print creatives and expressly included only an un-
ambiguous "request" term in the CBA/UPA, which the arbi-
trator ignored (by finding the agreement silent and ambigu-
ous) and contradicted (by requiring Players Association ap-
proval), thereby exceeding his authority— Accordingly, nei-
ther case supports the Players Association's overly broad
contention.

Next, the Players Association argues that "an arbitrator
may find ambiguity created by the silence of the agreement
on the particular question at issue," relying mainly on *North-
ern Indiana Public Serv.*, 243 F.3d at 347. (Appellee Br. 27 (in-
ternal quotation marks omitted).) *Northern Indiana Public
Serv.* addressed a collective bargaining dispute between an
employer and union over a PRP chart that tied pre-tax oper-
ating income to bonus percentage and depicted a range from
346 million dollars (corresponding to 0.0 percent bonus) up
to 382 million dollars (corresponding to 6.0 percent bonus).
243 F.3d at 346. That year, the pre-tax operating income was
391 million dollars, causing the parties to submit the follow-
ing issue to arbitration: "if the … operating income went off
the chart would the bonuses go off the chart as well?" *Id.* The
arbitrator issued an award for the union, after finding that

the agreement "expressly provided a floor for bonuses, but was silent as to a cap" and examining extrinsic evidence "[t]o clear up any ambiguity created by the silence." *Id.* at 347. The district court and this court confirmed the award, holding that "the arbitrator engaged in contract interpretation. And, although the arbitrator was not empowered under the CBA to add terms to the PRP, arbitrators are empowered to fill gaps left in contracts." *Id.* at 348.

The Players Association's argument is without merit, and *Northern Indiana Public Service* does not apply here. In *Northern Indiana Public Service*, the PRP chart was "silent" as to the bonus associated with 391 million dollars of operating income because it was "literally … off the chart," *id.* at 348, thereby resulting in an ambiguity or gap for the arbitrator to fill via contract interpretation. In contrast, as discussed, the CBA/UPA was *not silent* with regard for sponsor use of print creatives; it expressly provided that the US Soccer Federation "request, but not require" a sponsor donation to a player pool. Therefore, there was no ambiguity or gap for the arbitrator to fill, and the Players Association's argument fails.

The Players Association's remaining arguments are merely additional attempts to characterize the arbitrator's award as falling within his authority under the CBA/UPA. But as we have already established, the arbitrator's award exceeded his authority, pursuant to CBA § 5.8, because he ignored and contradicted the clear and unambiguous terms of the agreement.

In conclusion, we recognize that a goal of arbitration is to provide the parties with "swift, inexpensive and final decisions," but "this does not vitiate judicial review of an arbitrator's decision." *Anheuser-Busch*, 280 F.3d at 1144. Here, just

as the parties agreed to arbitration, they also agreed "to limit the arbitrator's authority and preserve[] their right to challenge decisions when the arbitrator had reached out and rendered a decision that stray[ed] beyond his delegated authority and is barred by the negotiated contract." *Id.*

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED. This case is REMANDED with instructions to VACATE the award of the arbitrator and enter judgment in favor of the US Soccer Federation.