In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2892

CONTINENTAL CASUALTY CO. and CONTINENTAL INSURANCE CO.,

*Plaintiffs-Appellants*,

*v.*

CERTAIN UNDERWRITERS AT LLOYDS OF LONDON,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19 CV 6531 — **Sharon Johnson Coleman**, *Judge*.

ARGUED APRIL 2, 2021 — DECIDED AUGUST 23, 2021

Before WOOD, HAMILTON, and KIRSCH, *Circuit Judges*.

WOOD, *Circuit Judge*. It would be difficult to overstate the strength of the Supreme Court's support for arbitration when the parties have elected to resolve their disputes using that mechanism. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, embodies a "national policy favoring [arbitration] and plac[ing] arbitration agreements on equal footing with all other contracts." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552

U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).

Arbitration and adjudication in court differ in a number of meaningful ways. One central distinction relates to the exceedingly narrow scope for judicial review of a final arbitral award. Whereas a decision by a court of first instance is usually subject to *de novo* review for questions of law, and more deferential, yet still meaningful, review for questions of fact, arbitration awards are largely immune from such scrutiny in court. The FAA spells out a narrow set of reasons that may support a court's confirmation, vacatur, or modification of an award, see 9 U.S.C. §§ 10–11, and the Supreme Court held that these "provide exclusive regimes" for review. *Hall Street Assocs.*, 552 U.S. at 590.

Recognizing this unfavorable terrain, Continental Casualty Co. and Continental Insurance Co. (collectively, "Continental") nevertheless seek in this appeal to set aside an arbitral award. The award arose out of a dispute between Continental and Certain Underwriters at Lloyds of London ("Underwriters") over the way in which reinsurance furnished by Underwriters should be calculated and billed. As required by contract, Underwriters submitted this matter for arbitration, and the arbitral panel ("the Panel") ruled in their favor. At Continental's request, the Panel later issued a supplemental award, called here Interim Order No. 3, in which it clarified how its primary award applied to certain future billings. Convinced that the arbitrators had strayed beyond the scope of the agreement, Continental brought this suit to set aside Interim Order No. 3, as well as a Post-Final Award Order in which the Panel denied Continental's motion for reconsideration of the interim order.

If our job were to assess the merits of Continental's position in the same way that we approach ordinary appeals, it is possible that we might come to a different conclusion. But we are constrained by the FAA, as interpreted by the Supreme Court. We therefore affirm the district court's order confirming the primary arbitral award, Interim Order No. 3, and the Post-Final Award Order denying Continental's motion to reconsider.

**I**

Continental Casualty and Continental Insurance are related primary insurance companies; they cover risks such as mass tort and pollution liability for their customers. But they do not bear the full burden of that potential liability; instead, they purchase reinsurance, which can be defined as "[i]nsurance of all or part of one insurer's risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium." *Reinsurance*, BLACK'S LAW DICTIONARY (11th ed. 2019). Continental issued multi-year liability policies to its customers, and it purchased its reinsurance from Underwriters.

Between 1966 and 1976, Continental Casualty entered into eight such reinsurance contracts with Underwriters, while from 1967 to 1978, Continental Insurance entered into seven, also with Underwriters. The 15 agreements were "treaty" reinsurance contracts, meaning that they applied to specific categories of insurance policies issued by the Continental company, as opposed to a contract issued on a specified policy for a particular company. A treaty contract, for example, might specify 1966 liability policies, while a specific contract might say "the 1966 liability policy held by XYZ corporation". The dispute now before us concerns five underlying accounts:

Ammco Tools, Inc.; Mine Safety Appliances; Mount Vernon Mills; Richardson Company; and Brunswick Corporation.

In the insurance world, we begin with the insurance company that deals directly with the insured. That policy will specify what is covered, what exclusions or exemptions exist, and what the premium will be. But if that insurance company wants to protect itself against obligations at the high end of the scale, it may wish to procure its own insurance against that risk. It is then known as a "cedent"—that is, a firm that is ceding or turning over part of its potential loss to a second company—and the company assuming the ceded risk is the reinsurer. If a reinsurance contract has a $1,000,000 retention, that means that the reinsurer is not liable to pay anything until the cedent has paid the first million to its insured.

For over 40 years, Underwriters and Continental agreed on the methodology for calculating reinsurance obligations. Continental paid its insured for its covered mass tort or pollution losses, and then it annually billed Underwriters for amounts in excess of the retention amount (*i.e.*, the amount at which the reinsurance kicks in) under the treaties. Even if the policy covered several years (typically three), Continental would calculate the retention amount on an annual basis. It did so both for losses contained within a single year and multi-year losses. If Continental's policies provided for aggregate limits of liability, Underwriters would indemnify Continental in the aggregate for any given policy year for amounts that exceeded the treaties' annual retention amount. They did so under a provision of the treaty known as the Aggregate Extension Clause.

Things changed in 2010 when Continental outsourced its claims handling to Resolute Management, Inc., a third-party

administrator. Resolute took the position that for a multi-year loss, only one retention amount needed to be paid. This change resulted in higher demands for payment from Underwriters. For a loss extending over three years, for instance, assuming a $1,000,000 retention, the new methodology made Continental responsible for only $1,000,000, instead of $3,000,000. Underwriters objected to this change, and after unsuccessful efforts to resolve the matter, they sought arbitration.

The pertinent arbitration clauses all required "any dispute" to be submitted to a three-person panel of insurance industry experts. They also contained the following language:

> The arbitrators shall interpret this Agreement as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law, and they shall make their award with a view to effecting the general purpose of this Agreement in a reasonable manner rather than in accordance with a literal interpretation of the language.

Underwriters asked the arbitrators to issue a declaratory judgment specifying how the limits and retentions in the five specified reinsurance contracts apply to multi-year policy losses that either had been, or would in the future be, presented by Continental.

The Panel conducted a hearing, at which each party presented opening and closing statements, witness testimony, and proposed awards. The hearing concluded on July 16, 2019, and on July 17, the Panel issued its Final Award. It found that Continental's new methodology on aggregation was

contrary to the parties' established course of dealings, and held as follows:

> Petitioners [Underwriters] have paid the full amount due, if any, under the Aggregate Extension Clause with respect to Ammco Tools, Mount Vernon Mills, Mine Safety Appliances and Richardson Company . . . and Respondents [Continental] are precluded from re-presenting, re-packaging, or otherwise re-billing Petitioners for any of the Product Losses.

SA180 ¶2.

Concerned that the Final Award was not clear about Underwriters' future reinsurance liability obligations for those accounts, Continental asked the Panel to clarify whether the statement "Petitioners have paid the full amount due" related only to past bills already submitted at the time of the arbitration, or if it was meant to cover past *and* future billings. The Panel's umpire responded that he saw Continental's point, and he gave Underwriters five days to "plead their case."

Underwriters took advantage of that opportunity and argued that the Final Award was unambiguous and precluded both past and future billings. They suggested that no clarification was necessary, but they also argued that if the Panel did choose to revisit the Final Award, it should order Continental to pay their attorneys' fees and costs. The Panel denied the latter request. It also issued Interim Order No. 3, in which it denied Continental's motion for clarification but added "As such, Petitioners [Underwriters] have fully and finally discharged their past, present and future obligations for Ammco Tools, Mt. Vernon Mills and Richardson Company Asbestos products losses."

Dissatisfied with this outcome, Continental filed a motion for reconsideration. As now "clarified," it argued, this award had become a sanction. It contended that Underwriters had never asked the Panel to bar Continental from submitting future bills. Moreover, it argued, the Panel lacked the authority under the arbitration agreement to issue sanctions or penalties. The ban on future bills, it said, would unjustly deprive it of millions of dollars. Underwriters disagreed with the accusation that they had not addressed future billings; they had indeed done so, they represented, and they added that the Panel was empowered to grant this relief. The Panel denied Continental's motion for reconsideration in a Post-Final Award Order.

Continental then turned to the district court, where it sought confirmation of the Final Award but vacatur of Interim Order No. 3 and the Post-Final Award Order. See 9 U.S.C. §§ 9–10. It relied on section 10(a)(4) of the FAA, which permits a court to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Id.* § 10(a)(4). It pressed its argument that there was no contractual basis for Interim Order No. 3 and that the arbitrators did not have the authority to issue a punitive award without express authorization in the governing contract. Underwriters responded that relief from future obligations was appropriate as a matter of contract because Continental had committed a material breach of the reinsurance treaty.

The district court confirmed everything: the Final Award, Interim Order No. 3, and the Post-Final Award Order. It rejected Underwriters' characterization of Continental's

behavior as a material breach, but it also saw no merit in Continental's effort to characterize the Panel's remedy as punitive. Instead, looking back to the parties' agreement to arbitrate, it noted that the arbitrators had broad authority to formulate appropriate remedies under the "honorable engagement" provision, and that this is exactly what they did. This appeal followed.

## II

Continental accepts the district court's decision to confirm the Final Award, and so the only issue before us is whether the court erred by also confirming Interim Order No. 3 and the Post-Final Award Order. When reviewing a district court's decision to confirm an arbitral award, we approach questions of law *de novo* and, to the extent there are any facts that are properly before us, we review them only for clear error. *Standard Sec. Life Ins. Co. of New York v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020). The FAA requires us to approach this task with a very light hand. An arbitral award must "draw its essence" from the contract. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (cleaned up); see also *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

The scope of the agreement to arbitrate is critical in this connection, as the parties have the prerogative of giving either a broad or a narrow mandate to the arbitrators. A court must find a violation of the agreement to arbitrate before it may set aside the award. *Chicago Typographical Union No. 16 v. Chicago*

*Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991). Hard as it may be to set aside our normal rules for review, we must do so for arbitration, lest we undermine the institution. The question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, 838 F.3d 826, 832 (7th Cir. 2016) (quotations and citations omitted). Furthermore, ambiguity in an explanatory opinion does not justify setting aside an award. *United Steelworkers*, 365 U.S. at 598. Only if "there is no possible interpretive route to the award" may a "noncontractual basis … be inferred and the award set aside." *United States Soccer Fed'n*, 838 F.3d at 832 (quoting *Chicago Typographical Union*, 935 F.2d at 1505–06).

Continental urges us to find that this is the rare case in which an interpretive route to the two Orders it is challenging is utterly missing. Underwriters make a few points in response. First, they stress the fact that *this* arbitration clause permitted the Panel to resolve the dispute based on commercial realities, not just legal niceties. The honorable-engagement clause expressly recognizes this fact. And on a more practical note, Underwriters note that the order precluding future billings is found in the Final Award, not just the two later Orders that Continental is challenging. If we were to vacate those later Orders, we would be back to Square One, with an Award that Underwriters would be defending as clear and Continental would be attacking as ambiguous.

If the two Orders can survive review under FAA § 10(a)(4), we do not need to worry about the question whether there

was some punitive aspect to the award, or the question whether Continental committed a material breach. Those debates about terminology and legal characterization will fall by the wayside, so long as the arbitrators acted within the authority conferred by the contract. A close look at all three awards—the unchallenged Final Award and the two Orders—satisfies us that the arbitrators did not stray beyond the boundaries established by the parties.

*Arbitration Award*

The Panel's Final Award is brief and unexplained (as many arbitral awards are). But it is not hard to read it as precluding any future attempt by Continental to send old bills to Underwriters for asbestos loss claims for the designated companies, whether under the rebilling provision of the contract or another provision. The first four paragraphs of the award illustrate this point:

1. The billing methodology employed by Respondents subsequent to Resolute Management Inc. assuming claims handling responsibility for the claims at issue is contrary to the parties['] established course of dealing under the Aggregate Extension Clause under the Treaties and is therefore rejected.

2. Petitioners have paid the full amount due, if any, under the Aggregate Extension Clause with respect to Ammco Tools, Mount Vernon Mills, Mine Safety Appliances and Richardson Company ("the Product Losses") and Respondents are precluded from re-presenting, re-packaging, or otherwise re-billing Petitioners for any of the Product Losses.

3. Respondents are required to present future billings for incurred product/aggregate liability claims pursuant to the Treaties' Aggregate Extension Clause, unless the underlying loss can be objectively demonstrated to be a single occurrence under the relevant policy. . . .

4. The Brunswick claim is now closed with no amounts due from Petitioners and cannot be re-presented, re-packaged, or otherwise re-billed.

The use of the prefix "re," the present perfect verb tense in the second paragraph, and the use of the phrase "amount due" in paragraphs 2 and 4 covers old claims, but it does not say one way or the other whether future billings arising from new events may be submitted. Continental spotted this problem, and that is why it submitted its request for clarification.

*Interim Order No. 3*

The Panel's answer came in the form of Interim Order No. 3, which reads as follows in its entirety:

The Panel has carefully reviewed the submissions of the parties on Underwriters' Motion for Clarification and rules as follows:

The Motion for Clarification is **DENIED**.

As such, Petitioners have fully and finally discharged their past, present and future obligations for Ammco Tools, Mount Vernon Mills and Richardson Company asbestos products losses.

Andreas Stahl
Umpire

For and on behalf of the Panel

There are a few points one could make about this Order. First, it mistakenly said that it was Underwriters who had moved for clarification, though it was Continental. This error was fixed in the reconsideration order, set out below. Second, the Panel did not really deny Continental's motion. By referring to "past, present and future obligations" for the three listed companies, it eliminated any doubt about the coverage of future billings. Whether the arbitrators had the power to address future billings is a matter to which we return in a moment.

*Post-Final Award Order*

As we noted earlier, Continental was displeased with the response to its request for clarification, and so it moved for reconsideration. The Panel resolved that motion through the following order:

> The Panel has carefully reviewed the submissions of the Parties regarding Respondents' Motion to Reconsider or, In the Alternative, to Clarify ("the Motion") and rules as follows:
>
> The motion is **DENIED**.
>
> Interim Order Number 3 is **UPHELD** as stated, subject only to the clarification that it was the Respondents and not Underwriters who initially filed the Motion for Clarification which was the subject of Interim Order Number 3.
>
> The Panel is Functus Officio [finished with this matter].
>
> For a Majority of the Panel
>
> Andreas Stahl
> Umpire

For better or for worse, in other words, the Panel decided not only the specific billing methodology question that Underwriters originally had presented, but also what the consequences of its ruling were for the three companies it named. And it clarified the question that remained after the Final Order about the applicability of its ruling to future billings relating to asbestos products losses for those three companies.

The district court concluded that the arbitrators had the authority to address remedies as they ultimately did because the arbitral agreement called on them to "interpret the agreement as an honorable engagement and not merely a legal obligation." That language, it thought, gave the Panel wide discretion over remedies. The Second Circuit agrees with that view: "Courts have read such [honorable engagement] clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate." *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 261 (2d Cir. 2003). The First Circuit's understanding is similar. It has held that honorable engagement clauses "empower[] arbitrators to grant forms of relief, such as equitable remedies, not explicitly mentioned in the underlying agreement." *First State Ins. Co. v. Nat'l Cas. Co.*, 781 F.3d 7, 12 (1st Cir. 2015).

Although we have not spoken directly to the question of honorable-engagement clauses, we too have noted that "[i]t is commonplace to leave the arbitrators pretty much at large in the formulation of remedies, just as in the formulation of the principles of contract interpretation." *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 710 (7th Cir. 1994). When an arbitration clause is silent about the scope of the arbitrators' power, we have cautioned that "[n]o negative inference can

be drawn[.] … Silence implies—given the tradition of allow-
ing arbitrators flexible remedial discretion—the absence of
categorical limitations. Since that is the norm, we assume that
the parties would have said something in the arbitration
clause had they wanted to depart from it." *Id.*

We have no trouble seeing how the arbitrators in this case
might have thought that implicit in Underwriters' request for
resolution of the aggregate billing question was the conse-
quence of a ruling either way. The Panel may have thought
that, having announced that RMI's methodology was incom-
patible with the parties' course of dealing under the govern-
ing treaties, the efficient way to wrap up the case would be to
announce where that left both sides, for their past, present,
and future billings. Continental's decision to acquiesce in
RMI's aggressive position, the Panel might have thought,
might not have been a one-time event. By ruling on liability,
the Panel members (all, recall, from industry) may have been
striving to effectuate the broader purpose of the agreement.
That is enough, in our view, to show that the arbitrators' final
two orders fell within the scope of their authority.

Continental has one more arrow in its quiver: it argues
that the orders we are considering have the effect of wiping
out part of the benefit of its bargain with Underwriters. It
notes that the Insuring Clause found in Article IV of the agree-
ment is unqualified:

>     As respects the ultimate net loss to the Company
> arising out of each loss occurrence covered hereunder
> on which the Company has paid or advanced or agreed
> to pay or advance, or becomes liable to pay to or on
> behalf of its insured or reinsured an amount exceeding
> the applicable company retention as set forth in the

schedule hereinbelow provided, Reinsurers shall pay to the Company the applicable amount as provided in the schedule. …

Article IV continues by saying "[n]otwithstanding the provisions hereinbefore set forth in this ARTICLE: … In the event of termination of this Agreement, liability hereunder shall cease in respect of the unexpired portions of the Company's original policies."

Continental contends that Interim Order No. 3 and the Post-Final Award Order squarely conflict with this language and thus on that basis also that the arbitrators exceeded their authority. Those orders, it continues, effectively delete the "basic grant of reinsurance coverage to Continental for amounts that Continental pays to its underlying insureds." But that significantly overstates the scope and effect of the orders. Interim Order No. 3 precludes Continental only from billing asbestos products losses from Ammco Tools, Mt. Vernon Mills, and Richardson Company. *Ex ante*, we do not know whether any other losses, such as environmental liabilities, will ever materialize. If they do not, then there will be nothing that would trigger a reinsurance payment, but if they do, then the contract still has some force. In addition, some types of liability may not extend forever into the future. Asbestos is a good example. While there are still asbestos exposure cases in the courts, many companies have finally resolved this aspect of their legal exposure. The record does not tell us why the arbitrators deliberately cut off coverage for future asbestos claims for those companies, but they may have been persuaded that no such claims were likely to come along.

This is not a case in which the insuring agreements included specific directives or guidance with respect to remedy. The arbitrators thus had a relatively free hand in deciding how to wrap up the case. And once again, if there were any doubt on that point, the honorable engagement clause should remove it.

### III

When all is said and done, this dispute is nothing more than one between two insurance entities—a cedant and a reinsurer—about the way in which certain claims should be billed and the consequences for failing to use the proper methodology. The arbitrators reasonably thought that they needed information about both past billings and future amounts due. In the two post-Final Award orders, they specified how the named accounts should be treated. It is possible to find an interpretive route to those two orders. The arbitrators may have thought that the only way to implement the purpose of the agreement was to preclude all of the asbestos bills for the three named companies. The agreement gave them the power to resolve the case on general principles, not just legal entitlements, and that seems to be what they did.

Given the narrow scope of our role in reviewing arbitral awards, we must decline Continental's invitation to revisit this dispute. We conclude that the arbitrators did not stray beyond the boundaries of their authority, and so we AFFIRM the judgment of the district court confirming Interim Order No. 3 and the Post-Final Award Order.